THE ROSEHILL CEMETERY COMPANY

*v.*

WESLEY DEMPSTER *et al.*

*Opinion filed October 23, 1906—Rehearing denied Dec. 6, 1906.*

1. CORPORATIONS—*when rule against officer receiving compensation does not apply.* The rule prohibiting an officer of a corporation from receiving compensation for services rendered the corporation except where same was authorized by by-law or resolution adopted before the services were rendered does not apply to any other agent employed by the corporation in good faith for a proper purpose, nor to an officer respecting services not devolving upon him by virtue of his office.

2. SAME—*agent for corporation may be appointed by parol.* An agent may be appointed by parol to act for a corporation for any proper corporate purpose, and his acts within the general scope of his authority are binding upon the corporation, and all services rendered or benefits conferred through the efforts of such agent raise an implied promise upon the part of the corporation to pay, which may be enforced in an action at law.

3. Same—*corporation may ratify acts of party who assumed to act for it.* A corporation may ratify the acts of a person who assumed to act for it in a transaction, and thus remove the objection of want of authority, provided the acts are such as might have been legally authorized by the corporation.

4. Same—*when a party is entitled to hold stock given him for services.* Where a corporation having no board of managers is involved in litigation and is in financial straits, and one of the stockholders, by incurring personal liabilities and giving his personal efforts to the matter, succeeds in saving the corporation and placing it on a profitable basis, a resolution adopted by the board of managers, chosen upon the re-organization of the corporation, giving such stockholder shares of stock for his past services is binding upon the corporation and its stockholders, notwithstanding the stockholder was acting as an officer of the corporation on a salary at the time the resolution was passed.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. Tuley, Judge, presiding.

Edwin Burritt Smith, and Robert F. Pettibone, for appellant:

That the action of the board of managers in passing the resolution of September 14, 1896, at the instance of Wesley Dempster, was without authority and void, conclusively appears from the authorities. *Cheeney* v. *Railway* Co. 68 Ill. 570; *Railway Co.* v. *Cheeney*, 87 id. 446; *McNulta* v. *Bank*, 164 id. 427; *Brown* v. *DeYoung*, 167 id. 549; *Adams* v. *Burke*, 201 id. 395; *Ritchie* v. *MacMullen*, 25 U. S. Cir. Ct. of App. 50; *Brown* v. *Silver Mines*, 17 Colo. 421; Thompson on Corporations, secs. 4380, 4384; 2 Cook on Corporations, (4th ed.) sec. 657.

Where persons are engaged in a common enterprise and are similarly interested in the end proposed, in the absence of an express contract in advance for compensation for the services of any of them by the others there can be no implied contract for such compensation. *Heffron* v. *Brown*, 155 Ill. 322; 15 Am. & Eng. Ency. of Law, 1079.

Cannon & Poage, for appellees:

Wesley Dempster, as a stockholder, was authorized to act for the company in settling the controversy with Furber. *Higgins* v. *Lansingh*, 154 Ill. 301.

A person rendering services to a corporation not in the line of his official duty has a legal claim against said corporation for compensation. *Huffaker* v. *Trust Co.* 46 L. R. A. 384; *Cheeney* v. *Railway Co.* 68 Ill. 570; *Boggiano* v. *Maccaroni Manf. Co.* 202 id. 312; 99 Ill. App. 509; *Bassett* v. *Fairchild*, 52 L. R. A. 611; *Railway Co.* v. *Cheeney*, 87 Ill. 446.

Ratification by the directors of a corporation is equivalent to original authority. *Wood* v. *Whelen*, 93 Ill. 154.

Such ratification will entitle the agent to compensation. 1 Am. & Eng. Ency. of Law, (2d ed.) 1101; Mechem on Agency, sec. 602; Story on Agency, sec. 244; *Low* v. *Railway Co.* 46 N. H. 284.

Mr. Justice Vickers delivered the opinion of the court:

The Rosehill Cemetery Company filed its bill in the circuit court of Cook county against Wesley Dempster and Charles W. Dempster, stockholders of said company, for the purpose of compelling the surrender, for cancellation, of certain shares of stock held by the defendants below and to compel an accounting as to the dividends received by them on said stock. The theory of the bill is that the stock in question was wrongfully acquired by the said Dempsters and should therefore be surrendered to the said company and canceled, and all payments made on account of dividends should be re-paid by the defendants to the company. An answer was filed to the bill and the cause was referred to a master, who took the proofs and reported his findings and recommended a decree dismissing the bill for want of equity. The cause was heard in the circuit court upon exceptions to the master's report, which were overruled, and a decree was

entered dismissing the bill in accordance with the master's recommendation. Complainant below prosecuted an appeal from this decree to the Appellate Court for the First District, where the same was affirmed, and by further appeal the case was brought to this court for review.

The essential facts set up in the pleadings, and which the testimony fairly tends to prove, are as follows:

1. The special law incorporating the Rosehill Cemetery Company went into force February 11, 1859. The promoter of the enterprise, Francis H. Benton, purchased a tract of land in the town of Lake View, a few miles north of Chicago, and gave his notes for the sum of $35,568, secured by a mortgage on the land to John S. Newhouse, as part of the purchase money. About the same time he purchased a tract of land adjoining the tract first purchased, and in payment therefor he gave $5028 cash and a note secured by a mortgage upon this land for $25,140. These two tracts of land were all the property the Rosehill Cemetery Company owned when it commenced business. The company's capital stock was $150,000, divided into shares of $100 each. The company was financially embarrassed at the time it began its operations, and finally, being unable to meet its indebtedness, the control of its affairs passed out of the hands of the stockholders and into the hands of the creditors, who managed the company with a view of collecting the debts due out of its earnings. The creditors continued in the uninterrupted control of the affairs of the company until the year 1881, when a majority of the stockholders, believing that the earnings of the company had fully discharged its liabilities and desiring to again resume control of the company's affairs for themselves, entered into an agreement or formed what they termed a syndicate of stockholders for the purpose of instituting and carrying forward proceedings to secure their rights as stockholders. In pursuance of this agreement and in accordance with its terms, Killian V. R. Lansingh, as administrator *de bonis non* of the estate of John Dempster,

filed his bill of complaint in the circuit court of Cook county December 9, 1882, on behalf of himself and all other stockholders who should come in, against Van H. Higgins, Henry W. Blodgett, the Rosehill Cemetery Company and others, to redeem 937 shares of the capital stock of the company held by Blodgett as collateral security for the payment of the mortgage debt of Francis H. Benton, which had been assumed by the company, and for other relief. Long and vexatious litigation followed, which finally resulted in a decree in the circuit court of Cook county favorable, in the main, to Lansingh. This decree was afterward affirmed by the Appellate Court for the First District, and upon further appeal it was substantially affirmed in this court in January, 1895. For a detailed history of the Rosehill Cemetery Company in its long struggle with its liabilities and litigation, we refer to the statement made in this court in the case of *Higgins* v. *Lansingh,* 154 Ill. 301.

2. Wesley Dempster first became a stockholder in the company in the year 1881, and his business partner, Samuel H. Sweet, was joined with him in the ownership of 167 shares of stock. Afterwards, through his influence, his brother David Dempster bought stock in the company. When Lansingh began the litigation, in 1882, it was with the express agreement that the stockholders in the syndicate, which included Wesley Dempster, should contribute a *pro rata* share toward the expenses of the litigation, and that Lansingh should receive for his time and labor in prosecuting the suit one-third of the stock held by each member of the syndicate, with the exception of the stock held by Wesley and David Dempster and Samuel H. Sweet. They were not parties to the agreement to transfer stock to Lansingh in the event of the successful termination of the litigation. The mandate of this court was filed in the Cook county circuit court April 6, 1895, and the cause was re-docketed and an order of reference was made directing the master to state an account. A final decree was entered in the circuit court

November 22, 1895, in accordance with the decision of this court.

3. V. H. Higgins having died, Henry J. Furber, surviving partner of Higgins, succeeded him in the control of affairs of appellant. The stockholders who had organized the syndicate were still out of the actual control of the company and were anxious to secure enough stock to place themselves in control. While a decree had been entered defining the relative rights of the parties, it was not yet executed. A wide difference existed between the claims of the creditors and what the complainants in that case were willing to allow. The stockholders were disheartened by the long and expensive litigation, and some of them were unwilling and others unable to advance further sums of money for the expense of litigation. The accounts were complicated and the work of adjusting them promised to be both tedious and expensive, to say nothing of future litigation that was almost certain to result over disputed items. Besides, the stockholders had no available money and no means of raising any, and for that reason were harassed by the question of raising the money to pay Furber the amount that might be ultimately due him. Furber held 730 shares of the company's stock in pledge, and he exacted as a condition to the proposed settlement that the stockholders should purchase this stock from him at its face value. Wesley Dempster was an experienced and successful business man and had wealth and credit, so that his personal guaranty was satisfactory to Furber on any contract that might be made respecting the purchase of this stock. Dempster was willing to assume the personal liability demanded by Furber and the negotiations for a settlement proceeded. To secure himself against possible loss through the liability thus about to be assumed, Wesley Dempster entered into a written agreement with the other members of the syndicate, which recited, among other things, the pendency of negotiations for a settlement of the controversies relating to the properties of the Rosehill Cemetery

Company; that the company did not have at that time a board of managers legally authorized to bind it; that it could not act directly in negotiations, and that they were for that reason carried on by the stockholders. It also stated that Wesley Dempster was about to execute an instrument in pursuance of such settlement, creating personal liability against said Dempster, and that he might assume other obligations and incur other liabilities; that in consideration of Wesley Dempster's becoming bound the members of the syndicate agreed to hold him harmless, and to further secure him they pledged him all of the stock and interest of every kind and character they had in the company. It was provided that in case of loss the said Wesley Dempster should bear his share of it; also that in case of payments made by him he should, to the extent of said payments, be substituted and subrogated to all liens and claims and rights of the holders of such obligations. The agreement also provided that upon the said stockholders coming into possession and control of the corporation it would assume all rights, liabilities and obligations of Wesley Dempster under his contract with Furber. On July 27, 1896, a final agreement was reached between Wesley Dempster and Furber, and Wesley Dempster became liable to Furber for about $70,000, and thereupon Furber released the pledged stock of the company. On August 4 following, a meeting of the stockholders was held and a board of managers elected. Lansingh, Charles W. Dempster, Clancy J. Dempster and Henry Pitcher were elected on said board. The stock which Furber held was assigned to Wesley Dempster, and he held it to further indemnify him on his liability to Furber. At the stockholders' meeting on August 4 Wesley Dempster voted 956⅓ shares of stock which he owned and represented, together with the stock which he had obtained from Furber. On August 5 the board of managers met and elected K. V. R. Lansingh president, Charles W. Dempster auditor, and Wesley Dempster was elected treasurer and

made general manager, and his compensation was fixed at $300 per month. This is the first time that Wesley Dempster assumed any official relation to the corporation. The board of managers held a number of meetings and transacted various items of business after the re-organization prior to September 14, 1896. At a regular meeting held on that day the following resolution was introduced and adopted by unanimous vote:

"*Resolved,* That the Rosehill Cemetery Company issue to Wesley Dempster 50 shares of stock of said company out of any which said company may have purchased, which amount shall be in full for said Dempster's service rendered in effecting a satisfactory settlement of the litigation between its stockholders, and other matters relating to the welfare of said company."

This resolution was presented by Henry Pitcher after consultation with appellee Wesley Dempster. No objection was made by any one. There were present at this meeting, K. V. R. Lansingh, president; C. W. Dempster, auditor; Henry L. Pitcher, C. J. Dempster and Mr. William H. Turner, the last named being a hold-over manager from some previous election. H. W. Blodgett and James B. Bradwell, also hold-over managers, were not present.

4. By an amendment to the charter of the Rosehill Cemetery Company, which was approved February 13, 1863, it was provided that there should be set apart, and kept, preserved and expended as therein provided, the sum of ten per cent of all the proceeds received by the sale of lots by the Rosehill Cemetery Company until the fund reached the sum of $100,000, which was to be expended only for preserving, maintaining and ornamenting the grounds, lots, walks, shrubberies, memorials and structures in and about said cemetery and belonging to said corporation. This fund was increased from time to time until it reached the required amount, and it remained and was known as a "perpetual care fund," and could not be used for any other purpose than that mentioned in the charter. The corporation was authorized to loan this fund when not needed for the specified purposes,

and the evidence shows that this fund was loaned to members and pledges of stock were received as security. Appellee Wesley Dempster borrowed money from this fund and bought some of the stock that is in question, and caused five shares of it to be placed in the name of his son, Charles W. Dempster. He afterwards re-paid the money and took up his notes. The business of the corporation now became very prosperous, and in two years the company was able to pay off all its indebtedness and release Dempster from his obligations to Furber, which was done, and thereupon the stock which appellee Wesley Dempster held as indemnity was turned over to the company. At a stockholders' meeting held January 17, 1898, Wesley Dempster was made president of the company and his former salary of $300 per month was continued. On April 3, 1899, another meeting of the stockholders was held and Wesley Dempster was not elected to the board but was succeeded by another. All the stock of the company appears to have been re-issued at the rate of 5 to 1, so that the 50 shares which had been voted to Wesley Dempster by resolution of the board of managers September 14, 1896, became 250 shares, and it is charged in the bill that it is of the value of $25,000, although at the time it was received by Dempster it was not worth exceeding $5000. The affairs of the company had now passed out of the hands and control of Wesley Dempster, and this suit was commenced December 4, 1899, by the corporation alone, for the purposes above stated.

5. The first and by far most serious question presented is with respect to the 50 shares of stock given to Wesley Dempster by the resolution of September 14, 1896, in payment for the services rendered by him in procuring the final adjustment of the involved affairs of the company. There can be no question, under the evidence, as to the great value of these services to the corporation and to every stockholder. In fact, a crisis had been reached in the affairs of the company, and Wesley Dempster seems to have been the only

person who had both the ability and the disposition to take hold of the concern and steer it through its difficulties. Stock which was hawked about as almost valueless, through the skill of Wesley Dempster soon became eagerly bought up at par and in less than two years was worth five hundred per cent premium. In all his dealings on behalf of the stockholders Wesley Dempster acted with the strictest integrity and kept sacredly every promise he made. During the several months he was working to effect a settlement with Furber he was in constant consultation with the other members of the stockholders' syndicate and reported regularly the progress that was being made, and received constant encouragement to go on. Well may it be said as was said by Judge Tuley, who tried this case below: "If there ever was a case where, upon equitable principles, a person should be compensated for services rendered a corporation, there being no express agreement made beforehand to pay for the same, this is the one."

The law is well settled in this State that there is no implied promise on the part of a private corporation to pay its officers for the discharge of their usual duties. To recover for such services it must be shown that a by-law, or a resolution having the same effect, had been adopted fixing the amount to be paid such officer before the services were rendered. (*American Central Railway Co.* v. *Miles,* 52 Ill. 174; *Merrick* v. *Peru Coal Co.* 61 id. 472; *Cheeney* v. *Lafayette, Bloomington and Mississippi Railway Co.* 68 id. 570; *Lafayette, Bloomington and Mississippi Railway Co.* v. *Cheeney,* 87 id. 446; *Illinois Linen Co.* v. *Hough,* 91 id. 63; *Ellis* v. *Ward,* 137 id. 509; *Fritze* v. *Equitable Building and Loan Society,* 186 id. 183; 1 Morawetz on Private Corp. sec. 508.) This rule is invoked against the validity of the resolution of September 14, 1896, and it is contended that since the services of Wesley Dempster had ended before the resolution was passed, and he was at that time treasurer and general manager with a fixed salary of $300 per month, the

action of the managers in voting him 50 shares of stock for
past services is without authority and void. The case at bar
is neither within the letter nor the reason of the rule con-
tended for by appellants. Dempster was not an officer of
the corporation at the time when, at the request of the stock-
holders' syndicate, he undertook to settle its affairs with the
creditors. He was merely a stockholder clothed with such
powers and charged with such duties as grew out of that
relation. When he entered upon the work of making the set-
tlement with Furber he became the agent at least of the
stockholders who employed him, and we think it is very clear
that they ought to have no standing in a court of equity to
impeach a transaction in which they had so actively and
profitably participated. It must be borne in mind that there
was no active board of managers in charge of the company's
business, and, so far as the record shows, the so-called syn-
dicate of stockholders was the only managing body that was
making any pretense of looking after the interests of the
stockholders. There was nothing in the nature of the ser-
vices to be performed or in his relation to the company that
would have rendered a contract of employment with Demp-
ster illegal had the corporation been in a position to contract
with him before the services were rendered. The rule an-
nounced in the cases above cited, which prohibits the pay-
ment to an officer of a corporation for services except where
a by-law or a resolution provides for such compensation be-
fore the services were rendered, has no application to any
other agent whom the corporation may employ in good faith
and for a legitimate purpose; nor does it apply to an officer
respecting duties not devolving on him by virtue of the office
held. (*Cheeney* v. *Lafayette, Bloomington and Mississippi
Railway Co.* 68 Ill. 570, and cases cited.) The old doctrine
of the common law that an agent of a private corporation
could only be appointed under the common seal of the cor-
poration, if it ever was recognized by the courts of this
country, has long since given way to the modern rule which

is now firmly established, that an agent of a corporation can be appointed by parol for any proper corporate purpose, and the acts of agents thus appointed within the general scope of their authority are binding upon the corporation, and all services rendered or benefits conferred at the request of its agents raise an implied promise, to enforce which an action is maintainable against the corporation. (Story on Agency, sec. 53; *United States Bank* v. *Dandridge,* 12 Wheat. 63.) In justice and reason no substantial grounds exist why a corporation may not make contracts and assume liabilities within the scope of its powers in any manner that a natural person might employ, except in such matters as the charter or the laws of the State prescribe a particular method of procedure. It is a well established doctrine of the law of agency that a subsequent ratification of the act of one who assumed to be an agent supplies the want of previous authority. A corporation may ratify the act of one who assumed to act for it and thus remove the objection of want of authority in the first instance, provided the act be one which could have been legally authorized. 2 Morawetz on Corp. sec. 618; *Kelsey* v. *National Bank,* 69 Pa. St. 426.

The so-called stockholders' syndicate took charge of the affairs of this company. They carried on litigation for its benefit and then employed Wesley Dempster to complete the settlement of the differences with the creditors, which he did. The stockholders' syndicate represented more than a majority of the stock, but the majority was not available for purposes of management. After the end of the litigation had been reached, the settlement completed and the corporation was placed in control of the legally constituted managers, all that had been done by the syndicate in regard to the litigation and employment of Wesley Dempster was fully ratified. The benefits resulting from the advantageous settlement by Dempster were accepted by the appellant and its stockholders. For more than three years the company acquiesced in the action of its managers in compensating Demp-

ster for his services, and none of the stockholders made any protest until November, 1899, when R. F. Pettibone, an attorney who had, only a few days before September 14, 1896, received fifteen shares of stock as a fee for services rendered by him, entered a protest and caused it to be spread upon the records. Mr. Pettibone is one of complainant's attorneys in this case, and apparently assumes the position that it is legal for the company to ratify the action of the stockholders' syndicate in so far as the employment of an attorney is concerned, but that it is wholly without power to ratify the employment of Dempster. We fail to see any substantial grounds of distinction. If there was a just claim existing in favor of Dempster at the time he was chosen treasurer and general manager, for services that had been rendered before he assumed this relation, or if the services were outside of his official duty and were rendered after he became treasurer, no reason exists why the company could not ratify the same and compensate him after as well as before he became such an officer. The fact that for more than three years none of the stockholders made any objection to the action of the board is itself a strong circumstance tending to show that they approved what the board had done. It is not necessary that a meeting of the stockholders be held in order to ratify an illegal act of the board of managers. In *Brown v. DeYoung,* 167 Ill. 549, which was a bill to compel the return to the company of certain sums of money paid as salary over the amount fixed in the by-laws, it was said: "The court is of opinion that the knowledge of Houston, for the space of two years and upward, of the amount of salary received by Morden, (and by DeYoung,) and his tacit consent thereto and conduct shown by his own evidence and letters in the record, effectually debar him from any relief in this case as to the salaries of Morden and DeYoung." But independently of the question whether non-assenting stockholders would be estopped from asserting a claim to their share of the value of the stock in question, we are of the

opinion that the action of the board of managers in paying Dempster for his services was within the powers of the board, and that having voluntarily paid him, in good faith, a reasonable compensation, neither stockholders nor the corporation have any standing in a court of equity to compel Dempster to restore the amount thus paid. Being the legal owner of the stock, its subsequent increase in value, as well as accruing dividends, belongs to appellees, and no accounting need be had.

6. Charles W. Dempster is a son of Wesley Dempster. He borrowed from the "perpetual care fund" $300 belonging to the company, with which he bought three shares of stock. Wesley Dempster had bought some stock in the company in the same manner and also some with his own money. Of the stock held by Wesley Dempster, five shares were by his orders transferred on the books of the company to Charles W. Dempster. The eight shares held by the latter were subsequently re-issued as forty shares. Both Wesley Dempster and Charles W. Dempster subsequently paid in full their indebtedness to the "perpetual care fund." The contention of appellant with reference to the stock of Charles W. Dempster is that it was bought with funds of the company, and that if bought by Wesley Dempster or under his direction it was in violation of an alleged agreement that all stock purchased by members of the stockholders' syndicate should be purchased by or in behalf or for the use of the company. Appellant makes the same contention in reference to certain stock purchased by Wesley Dempster. The existence of such an agreement was one of the controverted questions of fact before the court below, which was determined against the contention of appellant. From an examination of the evidence in the record we are of the opinion that the finding of the court below is fully supported upon this as well as all other controverted questions of fact in the case.

There being no error in the record the judgment of the Appellate Court is affirmed.    *Judgment affirmed.*