**Empire Fluorspar Company, Appellant, v. E. A. Knight et al., Appellees.**

### Term No. 45F2.

Heard in this court at the October term, 1945. Opinion filed January 7, 1946. Rehearing denied February 14, 1946. Released for publication February 14, 1946.

FRANKLIN J. STRANSKY, FRANCIS V. HEALY and ROBERT G. DREFFEIN, all of Chicago, and A. E. SOMERS, of Harrisburg, for appellants; FRANKLIN J. STRANSKY, of Chicago, of counsel.

FEIRICH & FEIRICH, of Carbondale, CHARLES DURFEE, of Golconda and CLARENCE E. SOWARD, of Elizabethtown, for appellees.

MR. JUSTICE STONE delivered the opinion of the court.

This is a suit brought by Empire Fluorspar Company, a corporation, plaintiff appellant, hereinafter designated as plaintiff, against E. A. Knight, individually, and E. A. Knight, A. D. Knight, and E. C. Clark, a copartnership, and others, defendants appellees, hereinafter designated as defendants, for an accounting for unpaid royalties covering the five year term of a written fluorspar mining lease dated March 12, 1927, executed by said company and said copartnership on the basis of the terms of said lease and also for damages to the property. In addition thereto, plaintiff asks for an accounting covering the years 1932 to 1937, inclusive, during which time it is alleged said partnership, after the expiration of said

lease, as trespassers, wrongfully and without knowledge of plaintiff company, removed and sold fluorspar, zinc and other minerals from property owned by plaintiff.

The pleadings are quite voluminous. Count 1 of the amended complaint sets forth that plaintiff on March 12, 1927, was an Illinois corporation and was lawfully possessed of lands situated in Pope county, Illinois, aggregating 514 acres, together with all minerals underlying said lands, including fluorspar, lead, zinc and mining equipment; that on March 12, 1927, it executed a five year term written lease with said E. A. Knight, A. D. Knight, and E. C. Clark, a copartnership; said count setting forth in haec verba a copy of said lease; that at said time the top surface of the soil on said lands was in good level, affording easy access to the various shafts of the mines for the purpose of carrying on mining operations; that after the execution of said lease and during the five year term thereof, said defendants entered into mining operations under said lease, removing therefrom upwards of 10,000 tons of fluorspar and large quantities of lead, the exact tonnage and amounts of which could not be ascertained without an accounting by said lessees; that said lease by its terms terminated on March 11, 1932; that said lease also provided that said lessees would pay plaintiff company a royalty of $1.50 per ton on all fluorspar mined and marketed and 10 per cent of the gross proceeds of all other minerals taken from the property, with a guaranteed minimum royalty of $2,400 per annum after the first year; that at the time said lease was executed one Frank H. Staubitz was plaintiff company's president and manager, but that he died on May 15, 1930, and for a time said company was without management; that said E. A. Knight while one of the lessees of plaintiff company, and while said lease was in force and effect, acquired 334 shares of the stock of plaintiff company; that

thereafter on July 29, 1930 at meetings respectively of the stockholders and directors of plaintiff company said E. A. Knight was elected a director and vice president.

Said count 1, of the complaint further alleged that said E. A. Knight was possessed of a broad and extensive experience in matters of and concerning business, finance and corporate management, and was trained and skilled in the operation of fluorspar mines; that at all times after the death of Frank H. Staubitz, E. A. Knight was the only director of plaintiff company intimately acquainted with its business affairs and with any mining operations on said property; that the remaining directors of said company resided a long distance from said property and having taken no active interest in the affairs of the plaintiff's business, except as to royalties paid by said lessees under and by virtue of the terms of said lease; that on July 29, 1930, L. P. Staubitz, the owner of 333 shares, Nellie E. Pierce, executrix of the estate of Henry B. Pierce, deceased, the owner of 333 shares, and E. A. Knight, the owner of 334 shares, in plaintiff company, were elected directors; that at the directors meeting immediately following said L. P. Staubitz was elected president, E. A. Knight, vice president, and one Grover E. Holmes, secretary and treasurer; that in or about the latter part of 1932, said E. A. Knight was elected to the office of treasurer of plaintiff company and continued to act as such until the 8th day of November 1937, when A. C. Churchill was elected a director and secretary treasurer of said company; that the said L. P. Staubitz and the said Nellie E. Pierce reposing confidence and trust in said E. A. Knight as a confidential advisor and one of the directors of plaintiff company and believing his statements to be true, made no further demand on said E. A. Knight for an accounting until on or about the 8th day of November 1937, when A. C. Churchill, newly

elected director and treasurer-elect of plaintiff company, demanded of said E. A. Knight that he report his acts and doings as treasurer of plaintiff company; that at said time said E. A. Knight advised A. C. Churchill that he was unable to render an itemized statement of receipts and disbursements or to furnish any information about the affairs of plaintiff company for the reason that all books and records of plaintiff company were lost and destroyed.

Said first count further alleged that during all the period of time said E. A. Knight acted as director and lessee of plaintiff company he assumed a fiduciary relationship toward plaintiff company; that during the time of said relationship he made large and divers profits and gained much property by reason of his relation as lessee and director of plaintiff company; that after the time said E. A. Knight was elected to the office of treasurer up to November 8, 1937, no corporate meetings were held nor was any business transacted or communicated to the remaining directors, except with reference to the filing of income tax, capital stock tax and franchise tax returns.

Count 2 was substantially the same as count 1.

Count 3 set forth that in or about the month of March 1938, plaintiff learned for the first time that after the expiration of the five year term of said lease, and during the years 1933 to 1937, said E. A. Knight, A. D. Knight and E. C. Clark, individually and as copartners, without any right or authority and as unlawful trespassers, employed various persons (naming them) to enter plaintiff's property and to remove fluorspar to the extent of 9,000 tons, owned by plaintiff and without the knowledge or consent of plaintiff.

In their several separate and joint answers said defendants admitted the corporate existence of plaintiff company and the ownership by it, on March 1927 of 514 acres of land described in the complaint. They further admitted that after the death of Frank H.

Staubitz, he, the said E. A. Knight was named as director and vice president of the company.

Defendants averred that they had no sufficient knowledge of matters set forth in the complaint to enable them to answer with reference to what occurred at the meeting of the board of directors on March 28, 1938, at which meeting there were present E. A. Knight, L. P. Staubitz, and A. C. Churchill, and with reference to large portions of fluorspar and other substances being taken out of said mine without lawful right or authority during the years, 1933, 1934, 1935, 1936 and 1937, or with reference to the filing of reports as required by the State of Illinois.

The answers further set forth, by way of special affirmative defense, that at the expiration of the five years mentioned in said lease, they elected to and did extend the terms of said lease from year to year for five years in keeping with the terms thereof, and that from time to time after the commencement of said extension they continued the operation of the mine, paying the plaintiff company a royalty of $1.50 a ton.

It is further set forth in the answers, as a special affirmative defense to count 3 of the amended complaint, filed August 15, 1940, that the extension of said lease and their possession and operation of the mine was fully known and acquiesced in by plaintiff and that in the operation of said mine said E. A. Knight, A. D. Knight and E. C. Clark, said lessees, did employ workmen to aid in the operation thereof, and that plaintiff is estopped from claiming that said defendants, or either of them, is guilty of trespass, and deny that they should be required to account.

Defendants further averred that on the 4th day of August 1927, plaintiff sold and assigned to one Albert Likens all of the royalty provided for and coming to it under the terms of said lease and authorized and directed said defendants as lessees to pay to said Albert Likens the royalty payments under said lease

and that thereafter, pursuant to said authorization said defendant paid said royalties to the said Likens and that plaintiff in consequence is estopped from demanding payment of said royalties from these defendants.

On August 15, 1940, defendants E. A. Knight, A. D. Knight and E. C. Clark filed their answer to count 2 of the amended complaint in which they set forth as an affirmative defense, an alleged cancellation or waiver of paragraph 5 of the lease providing that the lessees would guarantee and pay a minimum royalty to plaintiff from and after the year 1927 of $2,400 per annum, which said cancellation or waiver it was alleged was made with Frank H. Staubitz (then deceased) president of plaintiff, through a verbal conversation alleged to have been had between said Frank H. Staubitz and E. C. Clark, one of defendants.

By amendments subsequently filed October 13, 1941, by E. A. Knight, individually and by E. A. Knight, A. D. Knight and E. C. Clark, individually and as copartners, said defendants further set forth as a further affirmative defense the claim that the alleged wrongs set forth in said amended complaint if committed at all were barred by the five years Statute of Limitations.

In answer to the allegations of the complaint that defendants had from 1933 to 1937, both inclusive, without right or authority mined and carried away approximately 9000 tons of fluorspar, defendants as an affirmative defense alleged that on or about the 29th day of July 1933, defendant E. A. Knight became a director and officer of plaintiff company, and as such knew of these operations, and acquiesced therein and the knowledge of said E. A. Knight as such officer was properly chargeable to plaintiff company, whereby said company should be held estopped from complaining of such wrongs.

Defendant E. A. Knight also set up a tender of $1,314.30, as another affirmative defense.

Replications filed by plaintiff denied any and all new matters as set forth in said answers and amendments thereto, and rejoinders were filed by defendant E. A. Knight individually and E. A. Knight, A. D. Knight, and E. C. Clark, a copartnership, denying the affirmative averments of said replications.

The cause was referred to a special master in chancery, to take proof and report findings.

The master recommended a decree against E. A. Knight for $1,314.30, which was the amount tendered, without costs, also a decree against E. A. Knight, A. D. Knight, and E. C. Clark, partners in the amount of $2,638.46 and costs, and that suit be dismissed as to all other defendants.

Both plaintiff and defendants filed objections to the report of the master, which were allowed to stand as exceptions, and all exceptions were overruled by the court except that one half of the costs were assessed against the plaintiff and judgment for the remaining half was given against the partnership. From this decree, appeal is prosecuted to this court.

The record is large. It is shot through with accusations, charges of false swearing, deception, fraud, violation of fiduciary relations, contradictions, etc. This makes more important than usual the findings of the master, approved by the chancellor. The master saw the witnesses and heard them testify. He doubtless had personal acquaintance with most, if not all, of them. He was in a much better position to judge of the weight and credibility to be given to their testimony than an appellate court can be.

To the findings of the master, and his supplemental findings, a very large number of objections was filed by the plaintiff. Most of these, however, are not urged here, and consequently are considered waived by this

court. We shall deal with the case on the assignments of error of the respective parties which are presented to this court in the briefs.

On March 12, 1927, the defendants Knight, Knight & Clark took possession of the premises in question and operated them as fluorspar mine for a period of some nine to ten years, the exact length of time being somewhat indefinite in the record. The character and right of their operations for a part of that time is brought strongly in question.

The case may well be divided into two phases: first, the period from 1927 to 1932 under which the defendants operated in pursuance of the lease; secondly, the balance of the time under circumstances which the plaintiff has sought to designate as trespass.

The first assignment of error is: "The Master erred in finding and recommending, and the Chancellor erred in approving, the portion of the Master's Report which found by inference only that during the time said defendants mined, removed and sold fluorspar and other minerals from the mine in question covering the period from 1933 to 1937, they did so as a matter of right with full knowledge on the part of plaintiff that mining operations were going on during all of such time; the Master and the Chancellor should have found from the evidence that there was no renewal of said lease from year to year and no waiver of the advance deposit of $1,000 per year as specified in said lease, and that the plaintiff did not have knowledge of the operations going on on said premises during 1933 to 1937, and did not know of such operations until sometime in 1938 and that during said time defendants mined said premises without right or authority as trespassers and were liable, as such, for the full value of the fluorspar removed and sold."

This assignment, if we take them in their order, compels us to discuss the second phase of the tenancy first. Surely defendants would not be trespassers

merely by the fact that they continued to operate the mine after the first five year term expired. The lease gave them right to do that. Furthermore, it was done under the direction of two of the stockholders of plaintiff, one of them a director. It is apparent, therefore, that the claim of plaintiff that defendants were trespassers is based upon the fact that defendants did not pay the sum of $1,000 advance royalty. That brings us to a discussion as to whether this advance royalty was waived. The master found that it was. Beyond these contentions the evidence shows that defendants paid the $1.50 royalty on all fluorspar taken from the Empire mine, and the mine got the benefit of it either in payment of its debt, or in cash. It would not be a trespass to mine the ore at the price agreed upon in the original lease. The alleged trespass, therefore, must rest upon the failure to pay the $1,000 royalty. Otherwise the terms of the lease were complied with.

To our minds, this $1,000 royalty as well as the $2,400 royalty which was to obtain during the first five years of the lease is conclusively shown by this record to have been waived. First of all, two witnesses called by plaintiff, E. C. Clark and Mr. Likens, testified that they visited the president of plaintiff with the lease in their pocket, for the purpose of cancellation; that they told him that they could not operate and pay the $2,400 advance royalty, and that they had decided to give up the lease. This the lease provided for in terms. The president then told them to go ahead, pay the royalty of $1.50 and that the company would waive the advance royalty. This evidence is undisputed. The president at that time was the sole manager of the company, had the authority to speak for it, and in our judgment under the law had undoubted power to waive or cancel this portion of the lease. Secondly, said waiver was acquiesced in by all the parties and no demand was ever made for it again by anybody until this lawsuit was started. Plaintiff knew,—it must

have known, through its president it was charged with such notice,—that the mine was being operated on the new scheme of $1.50 royalty per ton. This made a perfect setting for the waiver of the $1,000 royalty for the last five years, if, in fact, it did not fully waive it as a modification of the lease. It was apparent to everybody concerned that defendants could not operate the property and pay the $2,400 advance royalty; they were losing money. Is it likely that under that circumstance they would take up the proposition of a thousand dollars a year royalty for the second five years, after the mine had been worked and obviously could not offer the hope of being as good a mine as it was the previous five years? The waiver of the advance royalty was a reasonable thing to expect under the circumstances. The proof shows affirmatively that it was waived. When we add to this the doctrine of constructive knowledge on the part of the stockholders it seems to us conclusive that all parties acquiesced the arrangements. It would be a very unusual circumstance that the stockholders of plaintiff would sit idly by and never inquire what was going on in and about their property for years. The very things which plaintiff now claims helped to deceive them were enough to put them on inquiry. They made no complaint. In this they were distinctly negligent.

As to assignments 2 and 3, 4 as in our judgment the proof shows that both advance royalties had been waived, there is nothing further to say except that the master was wrong and that the chancellor erred in not finding that the $2,400 royalty had been waived.

It is urged that E. A. Knight acted in a fiduciary capacity to plaintiff. This might present a debatable question were it material here. However, if we are correct in our conclusion that the advance royalties were waived, then the record shows that E. A. Knight fully discharged any obligations which the law placed upon him because of such fiduciary relation.

From this point this case proceeds upon the accounting which was made under the direction of the master in chancery, and which accounting has been approved by the chancellor. Bitter attacks are made upon the character of proof admitted whereby the master made his findings of accounting, but nothing affirmative is shown. It is not enough to say that evidence is untrustworthy unless the court is shown wherein it is untrustworthy. The record in this case shows that the original record of accounts of the defendant was in court; that an audit was made from it, that it was open for examination to plaintiffs and that plaintiffs actually used it on cross-examination. Much is said about the books of the company being washed away by the great flood which came upon that locality and effected this defendant company. This book, among other property, was washed away and lost and remained lost for some two or three years until it was found in a barn where the witness who identified it had left it. Plaintiff attacks this and attempts to ridicule it and casts suspicion upon it. Maybe it looks suspicious, but the fact remains that the evidence shows affirmatively that it is the book of accounts, that it was found and that it was brought into court for all parties to use. Courts cannot decide issues of importance on suspicion or vituperation. There is no evidence of an affirmative character which in any way contradicts the statements of the witness concerning this book. The only thing that is said against it is in substance that it is very fishy.

The auditor Harry Curtis made an audit of this book. The sheets of the audit are in evidence as defendant's Exhibits 12, 13 and 14. This audit was made in the usual way; was offered to the court in the usual way with the book of accounts on which it was made in the court ready to be offered in evidence, and we cannot see, under the authorities, wherein it fails to be competent. Whether or not it is trustworthy is

a subject that counsel may believe or not believe, and may argue for or against. But the fact is that it was in evidence, and competently in evidence in our judgment. *Stevick v. Vennum*, 227 Ill. App. 86; *People v. Hartenbower*, 283 Ill. 591. The master acted upon it, and that cannot be overthrown by the mere statement that the finding of the book was fishy, and that the evidence of the witness Curtis was not to be believed. Issues are not decided that way. Further it was shown by this book and testified to by the witness who made the figures, that they were made in the regular course of business; they came from the shipping accounts, and that they are true and correct. The evidence also shows that the accounts of the three or four mines which the defendant operated were kept separately, and that the product mined from the various mines was never commingled until it was actually put in the car. Each had a separate bill of lading.

So we cannot understand the claim of the plaintiff for the large amount of fluorspar which it said was mined between 1932 and 1937 and sold and not accounted for except upon the theory that they claimed an interest in all the product which came from the various other mines which defendants operated. This is not borne out by the evidence and the conduct of the parties in dealing with the product of the different mines is not such as to make defendant responsible for plaintiff's claim of all of the amount of fluorspar that was handled by the defendant during those years. Such claim, it seems to us under the facts and circumstances and the actual proofs shown by this record, are extravagant indeed. So far as we can see from the evidence in this record the master and the chancellor ruled correctly as to the accounting for those years.

Much argument is indulged in by the plaintiff on the question of the tender made by E. A. Knight of $1,314.30, the amount of his individual indebtedness.

In this argument counsel made the unqualified statement that no tender was ever made. It is difficult to deal with statements of this character which are entirely disproven by the record. The evidence shows conversation between the agents of plaintiff and Mr. Knight in which this tender was made and the parties agreed to accept it as payment in part, which Mr. Knight declined. Had he accepted their proposition it would have been a suggestion at least, if not an admission, that it was only in part payment and that he still owed more. But the point about it is that all hands know that this tender was made in manner and form as it was made.

After this naked statement that no tender was made plaintiff proceeds with argument that the tender was not kept good. This is a very certain admission that the former blanket statement was wrong. It would be difficult indeed to keep good or not keep good anything which never was made at all. We have gone through the law cited and other cases on the subject of tender. This tender is not subject in our judgment to the technical rules laid down in cases at law. The evidence here shows that Mr. Knight made the tender, that he was ready, able and willing at any time to pay it and that he actually deposited it in the bank waiting until such a time that it should be paid. This the chancellor held was a sufficient tender in equity. In *Thompson v. Crains,* 294 Ill. 270, our Supreme Court said in substance "that in a court of equity the law interprets the conduct of the parties as to a tender according to their apparent intention and determines its sufficiency upon the objections which are then stated." We are of the opinion under the facts and circumstances shown by the evidence that the chancellor ruled correctly in holding that Mr. Knight made the tender and that said tender was kept good as a tender in equity.

Unless we were disposed, which we are not, to wipe out the accounting made by the master in chancery and approved by the chancellor, this case must rest upon whether the waivers of the advance royalties were had. As to the facts of these waivers there can be no question from this record. As to their legality we find ample authority in the following authorities: *Selman v. Geary*, 334 Ill. 642; *Becker v. Morstadt*, 381 Ill. 422; *Geo. E. Lloyd & Co. v. Matthews*, 223 Ill. 477; *Independent Brewing Ass'n v. Powers*, 80 Ill. App. 471; *Rosehill Cemetery Co. v. Dempster*, 223 Ill. 567.

A decision of this case has been made difficult and laborious because of the minutia of argument on matters which have been of no probative value to this court. The plaintiff far from carrying the burden of proof has offered little or no affirmative evidence to prove its complaint. Much has been written on the theory of throwing suspicion on much of the evidence, both oral and documentary, offered by the defendants, but affirmative proof is lacking. The master elected to believe the witnesses.

When all is said and done the simple story is that the defendants leased the mine in question from the plaintiff; they operated it for some 10 years, paid a dollar and a half a ton royalty on the fluorspar taken therefrom. The advance royalties were waived. The master's report is replete with figures showing the payments of these royalties. There is substantially nothing to dispute the accuracy of these figures.

The trial court did not abuse its discretion in apportioning the costs. However, since the account of this case is to be recast, it may become necessary for the trial court to review, and perhaps recast, his own findings and orders as to costs. This should be done in pursuance of the new account.

Except as to the error of the court in refusing to hold that the $2,400 advance royalty was waived, we find no error in this record to justify a reversal. In

view of the holding as to that royalty it is our judgment that this case should be reversed and remanded to the trial' court with instructions to that court to recast its account in harmony with the views herein expressed. It is so ordered.

*Reversed and remanded with directions.*

CULBERTSON and BARTLEY, JJ., concur.