SPOOR v. Q. & C. CO.

No. 9090.

Circuit Court of Appeals, Seventh Circuit.

May 12, 1947.

530

William McKinley and Paul E. Price, both of Chicago, Ill., for appellant.

Will A. Kelly, of Chicago, Ill., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This action was commenced by Bessie Laughlin Spoor as Administratrix of the estate of Elmyr A. Laughlin, deceased, to recover royalty payments alleged to be due under certain patent licensing agreements entered into between Laughlin and the defendant. After institution of the suit, by leave of court, Herbert R. Johnson, James Chester Johnson, Ellen B. Johnson and Mildred Johnson Clark, as heirs at law and beneficiaries under the last will and testament of James Brook Johnson, deceased (hereinafter referred to as the Johnson heirs or the plaintiffs), intervened in said cause and filed a complaint alleging themselves to be entitled to the royalties claimed by the Administratrix of Laughlin's estate.

Upon motion of the defendant a summary judgment was entered in its favor upon the complaint of Bessie Laughlin Spoor as Administratrix of the estate of Elmyr A. Laughlin, deceased, and the suit thereafter continued upon complaint of the Johnson heirs. The case was heard by the court without a jury, and a judgment rendered against the defendant in the sum of $4,235.-99, from which judgment this appeal comes.

Elmyr A. Laughlin on September 14, 1923 entered into an agreement with the defendant whereby the latter was licensed to make, use and sell certain patented inventions during the life of patents and patents to be granted pursuant to applications described in said agreement. This agreement on January 24, 1927 was modified in writing, whereby the amount of minimum royalty payable by the defendant was reduced from $5,000 to $3,000 per year. On December 21, 1923, the said Elmyr A. Laughlin executed a written instrument, purporting to assign to Ellen B. Johnson, Executrix of the estate of J. B. Johnson, a certain interest in this license agreement. Plaintiffs' suit is predicated upon this assigned interest.

The contested issues are (1) whether the instrument sued upon (the purported assignment) was enforceable against the defendant; (2) whether defendant's discontinuance of the manufacture of the devices covered by the license agreement after December 17, 1932 effected a cancellation of such agreement under a clause "in case the licensee * * * shall discontinue business, this license agreement is automatically cancelled"; (3) whether the conduct of the parties amounted to an abandonment of the contract, the defendant having discontinued the manufacture of devices covered by the licensing agreement and having discontinued all payments thereunder for a period of more than ten years without demand on the part of the plaintiffs that such payments be made; (4) whether plaintiffs should be held to have waived their right to minimum royalties or be estopped to claim the same after they accepted royalties upon an earned basis rather than minimum royalties as provided for by the licensing agreement, and (5) whether the defendant's liability, if any, is to be determined by the five-year or the ten-year statute of limitations.

A further statement of facts appears to be necessary. The license agreement of September 14, 1923 provided: "It is further

understood and agreed that the corporation [defendant] shall have the privilege at its option to cancel this agreement upon six (6) months' written notice to be served upon the party of the first part." The agreement also provided that in case of a default on the part of the defendant, continued for sixty days, "then the party of the first part [Laughlin] may, at his election, terminate this said agreement and all rights of the party of the second part [defendant] thereunder."

The assignment of December 21, 1923, so far as here material provides:

"Now, Therefore: In and for the valuable considerations already received and heretofore acknowledged, I hereby sell, assign, transfer and set over unto Ellen B. Johnson, Executrix of the Estate of J. B. Johnson, an undivided one-tenth (1/10) interest in and to the said license above described and in and unto all royalties, in the same amount (one-tenth) that may be received by me from the said licensee and I agree to pay and account for them to the said Ellen B. Johnson, Executrix, when and as received, and I further agree that in case of my decease, that the said Ellen B. Johnson, Executrix, may make demand direct on The Q and C Company and receive payments direct from them for her interests as they may appear."

The record is silent as to the treatment or effect accorded this instrument from the time of its execution until 1929. Defendant received a communication from Laughlin dated July 26, 1929, requesting that defendant "Until further advised kindly make checks and royalty statements covering 10% of royalties payable under my license * * * to J. B. Johnson estate." Apparently in response to defendant's request for a copy of any assignment relating to such 10%, Laughlin by letter dated August 19, 1929 advised the defendant:

"The assignments etc. mentioned will not be necessary; I asked for royalty checks be made for only 10% of the whole; this 10% has never been out of my hands and the title is clear in me; the other 50% remains 'as is.' "

In response to this request, the defendant on September 4, 1929 wrote Laughlin as follows:

"Royalty checks beginning with the month of July 1929 and to continue until you advise to the contrary will be made as per your request; in other words, 10% payable to the J. B. Johnson Estate and 50% payable to you, all of which we trust will be entirely satisfactory to you."

As promised in this letter of September 4, 1929, the defendant paid to the Johnson estate minimum royalties as provided in the license agreement for the remainder of the calendar year 1929 but thereafter until the end of 1932 tendered and paid to the Johnson estate royalties upon an earned basis by checks to which were attached statements of the royalty computations. Subsequent to 1932, no remittances were made by the defendant to the Johnson estate, and until the institution of this suit in 1943 by the Johnson heirs no claim was made or asserted against the defendant by the Johnson estate or its heirs. It is also pertinent to note that during this time no payments were made by the defendant under its licensing agreement to Laughlin or his estate or anybody else. Laughlin died in April 1931.

■ The defendant argues that the Johnson estate acquired no interest under the instrument of December 21, 1923, but that it merely represented a personal obligation on the part of Laughlin. We do not so construe it. The words "sell, assign, transfer and set over" appear sufficient to convey all of Laughlin's interest in the subject matter of the agreement to the Johnson estate. True, the instrument indicates that the royalties assigned were to be received by Laughlin, with an agreement on his part to account to the estate for the same. A fair construction of this language, so we think, means nothing more than that Laughlin was designated as a trustee for the estate and was obligated to account to the latter for the royalties received. It may be that the Johnson estate during the lifetime of Laughlin could not have proceeded directly against the defendant, and that the latter if it had made payment to Laughlin as trustee would have had a good defense against an action by the Johnson estate. The instrument, however, provided that after Laughlin's death the Johnson estate "may make demand direct on The Q and C Company [defendant] and receive pay-

ments direct from them." Laughlin died in April 1931, and the royalties sought to be recovered in this suit all accrued subsequent to that date. We doubt if Laughlin's estate after his death could have maintained an action against the defendant because that right had been expressly conferred upon the Johnson estate. We think, as between Laughlin and the Johnson estate, the agreement constituted a valid assignment. Whether it was enforceable by the latter against the defendant is another matter, depending upon whether such enforcement would be prejudicial to the defendant.

▮ Furthermore, even though there be doubt as to the validity of the assignment, we are of the view that defendant by its conduct recognized the assignment in such a manner that it should not now be permitted to deny its validity. As already shown, it paid royalties to the Johnson estate for the years 1929, 1930, 1931 and 1932. True, it contends that these payments were made without knowledge of the assignment and because of the request made by Laughlin in his letter of August 19, 1929. In response to this argument, the lower court found:

"That the defendant had notice of the interest of the plaintiffs under said agreements on July 26, 1929 and on August 19, 1929 the defendant agreed to pay and thereafter until February 2, 1933, did pay said 10% of the royalties due under said agreements to the J. B. Johnson Estate."

We think this finding may reasonably be inferred from the assignment agreement in connection with the correspondence between Laughlin and the defendant, as heretofore related. Accepting this finding, as we must, the payments to the Johnson estate amounted to a recognition on the part of defendant that the estate had acquired the interest described in the assignment. Moreover, we do not understand that lack of notice on the part of a debtor will invalidate an assignment. It may constitute a defense in an action by the assignee if the debtor can show prejudice because it has not been notified. See Williston on Contracts, Vol. 2, Sec. 433 (page 1251). Applying this rule, defendant is in no position to complain, even though it received no notice, because it has shown no prejudice.

Defendant bases its argument on this phase of the case largely upon Bell & Howell v. Spoor, 225 Ill.App. 256. The facts in that case, however, are such that it does the defendant here little, if any, good. About the only similarity is that the court there had before it a purported assignment of a licensing agreement similar to that of the instant case. It was held that the cause of action remained in the licensor, notwithstanding a purported assignment to those who were plaintiffs in the suit. The case is readily distinguishable from the instant case, as is shown by the following statement from the opinion (page 265):

"In the instant case the parties not only expressly contracted that their acts should not constitute an assignment, but they provided that the company should retain the 'right to collect' and then should have certain duties to perform as to the payment 'of the total amount recovered' * * *."

In contrast, there is no provision in the contract between Laughlin and the defendant which inhibited an assignment by the former, and neither were there any duties imposed upon him inconsistent with his right to assign.

The second contested issue arises by reason of the following provision contained in paragraph 14 of the licensing agreement:

"In case the licensee, its successors or assigns shall be adjudicated bankrupt or shall discontinue business, this license agreement is automatically cancelled and it is understood and agreed that this agreement is a license only and shall not be construed as a sale."

▮ The court refused to admit defendant's offer of proof that none of the devices contained in any of the patents enumerated in the licensing agreement were used or manufactured by the defendant after 1932. It is claimed that the refusal to admit this evidence was error, as it would have shown an automatic cancellation of the license agreement under the "discontinue business" provision. We agree that this testimony was properly refused because of its immateriality. We find no occasion to analyze or discuss the numerous definitions of the word "discontinue," as contained in defend-

ant's brief. Obviously, the meaning to be attributed to the word depends upon the circumstances of its use. In the instant case, its use in connection with the clause in which it is found was evidently for the benefit of the licensor so as to prevent the license from falling into the hands of third parties unacceptable to the licensor upon the bankruptcy of or the discontinuance in business by the licensee.

Defendant at no time surrendered the rights which it had acquired by the license agreement. It no doubt could have at any time resumed the manufacture and sale of the devices described in the agreement. Would it be seriously urged that plaintiffs could have prevented the defendant from the exercise of such right on the ground that the agreement had been cancelled because defendant had previously discontinued the manufacture and sale of such devices? We think the question answers itself. Moreover, we have an idea that this claim of cancellation by discontinuance of the manufacture and sale was an afterthought. Defendant, if it had desired to do so, had at its command adequate means for cancellation of the license agreement under the provision which gave it an option to do so upon six months' notice. The exercise of this option, however, would have required it to surrender the rights and privileges which it had under the agreement. So instead of exercising its undoubted right to cancel, it was satisfied to retain all the rights and privileges which it possessed under the license agreement until faced with a demand for payment of royalties. We think there is no merit in this defense of cancellation by discontinuance of business.

■ The third and fourth contested issues, that is, abandonment of the contract by conduct of the parties and plaintiffs' waiver or estoppel from claiming minimum royalties, are closely related. It is argued that the defendant having discontinued for a period of more than ten years all operations under the contract without demand on the part of plaintiffs for performance, constituted abandonment and a rescission of the contract. We do not think so. As long as the contract was in existence it had the right to manufacture and sell the devices of the patents described in the agree-

ment or not, as it saw fit. In either event, it was obligated to pay a minimum royalty. On the other hand, plaintiffs had no duty to perform with respect to the license agreement and we know of no reason why they should be held to an abandonment because of their failure to demand the payment of royalties as they became due. They had a right to rely on defendant's promise to pay and enforce such right at any time within the proper limitation period.

Defendant's argument concerning the issue of waiver or estoppel is more plausible than any of the other numerous defenses invoked. It is predicated on the theory that defendant tendered and plaintiffs accepted royalties for the years 1930, 1931 and 1932, upon an earned rather than upon a minimum basis as provided in the agreement. Of the numerous cases relied upon by the defendant in support of this defense, the most pertinent perhaps is that of Empire Flourspar Co. v. Knight, 327 Ill.App. 626, 65 N.E. 2d 37, 41, in which case the defendant mining company was to pay certain minimum royalties under the terms of the lease for mining property. These payments were not made and the court, after consideration of the evidence, concluded that the payment of minimum advance royalties was waived. A brief statement from the opinion demonstrates the reason for the holding. The court on page 635 stated:

"To our minds, this $1,000 royalty as well as the $2,400 royalty which was to obtain during the first five years of the lease is conclusively shown by this record to have been waived. First of all, two witnesses called by plaintiff, E. C. Clark and Mr. Likens, testified that they visited the president of plaintiff with the lease in their pocket, for the purpose of cancellation; that they told him that they could not operate and pay the $2,400 advance royalty, and that they had decided to give up the lease. This the lease provided for in terms. The president then told them to go ahead, pay the royalty of $1.50 and that the company would waive the advance royalty. This evidence is undisputed."

■ In other words, the parties expressly waived the royalty provision of the contract sued upon. Here we have a different situation. Certainly the plaintiffs did not

534

expressly waive anything; in fact, the record shows that the defendant had no correspondence, conversation or dealings of any character with the plaintiffs except the tendering of checks in payment of royalties. It is true a witness for the defendant testified at the trial that these payments were predicated upon an earned royalty basis. In other words, the defendant had knowledge of the basis upon which royalties were paid but it is a matter of pure speculation as to whether plaintiffs had such knowledge. Defendant relies upon the checks and statements as proof of knowledge. Certainly they afford no direct proof and their value as circumstantial evidence is not convincing. It may be that plaintiffs by a process of calculation could have determined that they were receiving less than minimum royalties. This is the most that can be said for defendant's proof of knowledge. We think it was insufficient and for this reason alone the waiver and estoppel defense must be rejected.

In this connection, defendant urgently insists that a great wrong is being perpetrated upon it if plaintiffs are permitted to recover. It argues that it has been lulled into a sense of security by plaintiffs' acceptance of royalties upon an earned basis. In the absence of this asserted conduct on the part of the plaintiffs, it is claimed that defendant would have exercised its option to cancel the contract, which would have terminated its royalty obligation. We doubt if either party has intentionally pursued a course designed to deceive the other, but it appears that defendant is largely if not entirely responsible for the situation of which it now complains. If it had thought the agreement was cancelled when it discontinued the manufacture and sale of the licensed devices, why did it not so notify plaintiffs? If it thought that plaintiffs had waived their rights to claim royalties because they had accepted payments on an earned rather than on a minimum basis, why did not defendant surrender to plaintiffs the interest which they had acquired by virtue of the assignment? At no time did defendant communicate with plaintiffs in any manner as to the changes which it now relies upon to escape liability. In other words, defendant, with knowledge of its promise to pay, sat

idly by for a period of years without making payments to anybody or exercising its right to cancel the agreement, reserved and preserved for itself all the rights which it had acquired under the agreement, and when finally confronted with a demand to make good on its promises asserted for the first time that the contract had been cancelled by abandonment or that the plaintiffs had waived their right to enforce payment. The court below was not impressed with defendant's effort to escape liability and neither are we.

██ Finally is the question as to whether defendant's liability is to be determined by the five- or ten-year limitation period. This depends upon whether plaintiffs' suit is based upon an oral contract within Sec. 16 or a written instrument under Sec. 17 of the Illinois Limitations Act. Ill.Rev.Stat. 1945, Chap. 83. Defendant argues that plaintiffs' action is upon an oral agreement inasmuch as no contractual relation exists between a debtor and an assignee and that the obligation of the former arises by operation of law. We think this argument is not in point for the reason that the premise upon which it is founded is not sound. In other words, plaintiffs' cause of action is not predicated merely upon an assignment. If this was the only instrument involved we would have a question different from the one presented. Plaintiffs' action is predicated upon written instruments, including the license agreement between defendant and Laughlin, the latter's written assignment to the Johnson estate, defendant's written promise to Laughlin to pay and its actual payment by check to the Johnson estate of royalties, which it was obligated to do under the licensing agreement. This recognition in writing of the assignment and its obligations to the Johnson estate is such, in our judgment, as to bring plaintiffs' action within the ten-year limitation period. See Edwards v. Harper, 234 Ill. App. 296; Egan v. Boston Ins. Co., 110 Ill. App. 1.

Defendant further argues that the ten-year limitation provision is inapplicable because the cause of action cannot be maintained without the introduction of parol evidence. In this connection, it is claimed that parol evidence would be required to prove

the death of Laughlin and also that of Ellen B. Johnson, or in any event that the latter had been discharged as Executrix and that the plaintiffs are the heirs and legatees of the Johnson estate as alleged in plaintiffs' complaint. The main case relied upon by defendant in support of this phase of its argument is that of Conductors' Benefit Ass'n. v. Loomis, 142 Ill. 560, 32 N.E. 424, 426. There, the certificate of membership in suit certified that Loomis was a member of the Association but named no particular person as a beneficiary. The constitution and by-laws provided for the payment of a sum on the death of a member, to the person named in his will, otherwise to his widow, and if he left no widow then to his heirs at law. The court held that the five-year limitation provision was applicable and in so doing stated (142 Ill. page 567, 32 N.E.):

"A contract cannot be said to be in writing unless the parties thereto, as well as the terms and provisions thereof, can be ascertained from the instrument itself. If the party to a written contract is not named therein, the contract is defective, as containing only a part of the agreement. In such case the agreement is only partly reduced to writing, because parol proof must be resorted to in order to show with whom the bargain was made."

The gist of the decision resides in the fact that the widow (plaintiff) was not named as a beneficiary in the contract issued by the defendant; in fact, no person was named as such.

Another case relied upon by the defendant is Novosk v. Reznick, 323 Ill.App. 544, 56 N.E.2d 318, which quoted with approval the reasoning of the Loomis case. In the Novosk case, the plaintiffs as operators of defendants' motor busses brought suit against the latter to recover an amount which the defendants had contracted in writing with the Works Progress Administration to pay. In other words, the plaintiffs were third party beneficiaries and were not parties to the contract between the Works Progress Administration and the defendants. It was held under such circumstances that the action against the defendants was governed by the five-year limitation provision.

We think these cases are readily distinguishable from the instant situation. Here the Executrix of the Johnson estate was specifically named in the assignment and recognized in writing by the defendant as the person entitled to payments under the license agreement and payments were actually made to her. If defendant's argument is accepted, it would mean that every case brought by an Administrator or the heirs of a party to a written agreement would be under the five-year provision because it would be necessary to prove by parol evidence the death of the party to the contract and who was the Administrator, Executor or heirs at law. Likewise, a suit upon an insurance policy would come within the five-year provision because it would be necessary to prove by parol evidence the death of the insured and that the designated beneficiary was in existence.

While we find no case exactly in point, we are satisfied that the ten-year limitation period exacts no such requirements. A case somewhat in point is that of Jones v. Knights of Honor, 236 Ill. 113, 86 N.E. 191, 127 Am.St.Rep. 277. There, Jones held a certificate in the defendant association in which his wife was designated as beneficiary. She died first. The insured's heirs at law brought the suit. It was contended by the defendant that the five-year limitation provision was applicable because oral testimony was required to establish plaintiff's right to recover. The court stated (236 Ill. page 117, 86 N.E. 192.):

"Had the wife been living at the time the suit was brought, it could certainly not be contended that the contract was not written. The certificate specifically named her, yet it would have been necessary to introduce oral evidence to identify her as the beneficiary. Her death did not change the written contract to an oral one, and the introduction of the by-laws of the association, showing to whom the policy was then payable, does not make it an oral contract. We consider what is said in Conductors' Benefit Ass'n v. Loomis, 142 Ill. 560, 32 N.E. 424, cited and relied on by appellant, in harmony with this conclusion."

We conclude that the ten-year limitation period is controlling, as held by the lower

court, and that plaintiffs are entitled to recover royalties which became due within such period prior to the time of the commencement of their suit.

The judgment is affirmed.