IN THE MATTER OF THE ESTATE OF ALTON
GLENN MILLER, DECEASED.

Argued January 26, 1982—Decided July 13, 1982.

*Jerome C. Eisenberg* argued the cause for appellant, David Mackay, Jr., (*Clapp & Eisenberg*, attorneys; *Jerome C. Eisenberg, Susan S. Singer, Stuart L. Pachman*, and *Terence P. O'Reilly*, a member of the New York Bar, on the brief).

*John R. Orlovsky* argued the cause for respondent Stephen Miller (*Orlovsky, Grasso & Orlovsky*, P.A. attorneys; *John R. Orlovsky, Ronald E. Hoffman* and *Martin J. Arbus* on the brief).

*Bruce D. Shoulson* argued the cause for respondent Jonnie Soper (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan*, attorneys; *Bruce D. Shoulson* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal questions a trial court decision, affirmed by the Appellate Division, that an interest in royalties terminated on a specific date. The issue turns on interpretation of the contract granting that interest. The Chancery Division determined that a transfer by the widow of Alton Glenn Miller (Glenn Miller) to the appellant's father, David Mackay, now deceased, of a one-

third interest in certain royalties accruing from the sale of recordings of the Glenn Miller Orchestra terminated on March 15, 1967. The Appellate Division affirmed substantially for the reasons expressed by the trial court. We granted Mackay's petition for certification, 87 *N.J.* 407 (1981), and now affirm.

I

Because our holding is based principally upon inferences drawn from the circumstances surrounding the parties' dealings with each other, a recitation of the somewhat complicated facts is necessary. Beginning in 1939 David Mackay served as attorney and advisor to Glenn Miller. Until Miller's disappearance in 1944 while on a military flight, Mackay performed various legal services for Miller and assisted him in the negotiation and execution of several performance and recording contracts. Miller paid Mackay for these services. After the War Department officially declared Miller dead in 1945, Mackay served as attorney for Miller's estate. Under Miller's will, which was admitted to probate in Probate Division of the Bergen County Court (Miller having died a domiciliary of New Jersey), Miller's wife, Helen D. Miller, was named the sole beneficiary and executrix.

Although Helen Miller was executrix, Mackay handled all the finances of the estate. The estate's income, principally from royalties from the sale by RCA Victor (RCA) of recordings made by the Glenn Miller Orchestra before Miller's death, was sent to Mackay, who deposited it in the estate account. Mackay prepared any checks written on the estate account and mailed them to Mrs. Miller for her signature. During the years immediately following Miller's death the income from the RCA recording royalties declined steadily, from approximately $54,000 in 1948 to slightly less than $14,500 in 1951.

In response to this decline Mackay discussed with Mrs. Miller a proposal for a project that would increase the estate's earnings. This proposal involved the possible use of recordings of radio broadcast performances of the Glenn Miller Orchestra.

Thesè recordings, known as library reference recordings or "air checks," were made directly from the broadcasts and were intended by Miller to be used solely to evaluate the broadcasts and to improve the orchestra's performance. The sound quality of these recordings was poor, owing both to the static and noise attendant to the radio broadcasts and to the low level of technology in the recording process. Mackay had preserved these air checks after Miller's death.

In 1951 Mackay suggested to Helen Miller that perhaps RCA could do something with the air checks to "clean them up" and make commercial quality recordings from them. When Mrs. Miller agreed to this proposal, Mackay catalogued the air checks and later monitored their recording—a task characterized by an expert witness as "a monumental job." RCA determined that it was feasible to make commercial quality recordings from the air checks.

As a result Helen Miller, as executrix of the Glenn Miller estate, entered into a contract with RCA dated August 8, 1951. The contract provided that RCA would release one album a year for three years, each album to contain eight selections recorded from among 250 of the air checks. RCA agreed to pay the estate a six percent royalty on 91½ percent of all sales, to be paid semi-annually. The contract gave RCA the perpetual right to manufacture and release records of the selections made under the contract.

On the same day that she signed the RCA contract, August 14, 1951, Mrs. Miller signed a document, handwritten by Mackay, the legal effect of which is the issue in this appeal. The document stated:

> For value received the undersigned hereby sells, assigns, transfers and sets over unto David Mackay a sum equivalent to one-third of the royalties to accrue to the undersigned from the agreement of August 14, 1951 entered into simultaneously herewith between the undersigned and Radio Corporation of America covering the recordings and releasing of phonograph records to be made from Glenn Miller radio broadcast library reference recordings.

The recordings released pursuant to the 1951 contract met with greater commercial success than any of the parties had anticipated, wherefore the parties entered into a new agreement in 1954. Significantly, this agreement, and all later agreements discussed below, did not contain the distinctive feature of the 1951 contract that gave RCA a perpetual right to manufacture and release air check recordings. Indeed, Mackay acknowledged at trial that the earlier contract had been "superseded" and that the 1954 document became the "controlling agreement." The 1954 agreement provided that the estate would turn over to RCA all recordings of the Glenn Miller Orchestra, in any form, that had not previously been released. RCA agreed that between 1954 and 1959 it would re-record and release a minimum of 80 performances from these recordings and would pay the estate six percent of 90 percent of all sales. The new agreement also modified the method of payment, apparently to create a tax advantage to the estate. RCA agreed to pay the estate $50,000 a year from 1955 to 1959. Any income exceeding that amount would be retained by RCA as a reserve fund against future payments. Whenever the reserve fund exceeded $250,000, however, RCA would pay the estate the excess semi-annually as earned.

When she signed the 1954 RCA contract, Mrs. Miller also executed, at Mackay's request, a document nearly identical in wording to the 1951 document that granted Mackay a one-third interest in monies accrued under the 1951 RCA contract. This new document gave Mackay a one-third interest in monies accruing under the 1954 RCA contract with the exception, however, that his percentage would be computed and paid only after the estate received the first $15,000 each year. The reason for this change was that Mrs. Miller believed that since the estate was earning about $15,000 per year in royalties before Mackay had arranged for releases based on the air checks, Mackay was not entitled to receive one-third of that amount.

The RCA releases continued to meet with commercial success. In 1955 the parties again entered into a new contract. RCA

now agreed to release a minimum of 120 selections in the period between 1954 and 1962. The $50,000 per year minimum payment was continued, but the reserve fund ceiling was increased to $400,000. In all other respects the 1955 contract with RCA continued the terms of the 1954 contract. Once again Mackay requested that Mrs. Miller execute a document entitling him to one-third of the proceeds, after the first $15,000 per year, accruing under the 1955 RCA contract, but this time Mrs. Miller balked. The record contains several letters written by Mackay in 1955 wherein he requests that Mrs. Miller execute such a document. There is also a letter from Mackay to Mrs. Miller, dated April 15, 1958, wherein he refers to her wish that rather than having a blanket assignment related to each RCA contract, she would prefer to grant Mackay his one-third interest on a year-to-year basis. Mackay told her, however, that such a plan would have an adverse tax effect on the estate. For whatever reason, sometime after April 15, 1958, Mrs. Miller signed the document transferring to Mackay one-third of the income accruing under the 1955 RCA contract.

Meanwhile, in January 1958, RCA and Mrs. Miller had again amended their agreement. Other than an adjustment in the royalty rate for record club sales, the only changes were that the yearly payments were extended through 1964, the annual minimum payment was increased to $100,000, and the reserve fund ceiling was increased to $700,000. After some prodding in the previously discussed April 15, 1958 letter from Mackay, Mrs. Miller executed a document giving Mackay a right to one-third of the proceeds of the January 1958 amendment to the 1955 RCA contract.

There were three subsequent amendments to the 1955 RCA contract: 1960, 1962, and 1963. In each, the annual minimum payments were extended through 1965, 1966, and 1967 respectively. The reserve ceiling was modified in the 1960 and 1962 amendments. In all other respects the 1955 contract, as amended in 1958, remained in effect. As to the transfer of one-third of the proceeds to Mackay in 1960, Mrs. Miller signed a docu-

ment that was identical to those already discussed, save in one important aspect. This document stated that Mackay was to receive one-third of the monies to accrue under the 1955 RCA contract "and any amendments thereof." Mackay subsequently took the position that this additional language obviated the need for similar documents in connection with the 1962 and 1963 amendments.

None of the documents in which Mackay was given one-third of the royalties made any mention of how long he would continue to collect that amount. He continued to collect one-third of the royalties up to and through the time of Helen Miller's death on June 2, 1966.

In her will, Mrs. Miller left her entire estate in two testamentary trusts, one for each of her children, Steven Miller and Jonnie Soper, the respondents in these proceedings. Mrs. Miller's will appointed David Mackay as executor of the estate and trustee of the trusts. Mackay received executor's fees under this appointment. In addition, under Glenn Miller's will Mackay was named, along with one Chalmers MacGregor, as successor co-executor. When MacGregor decided not to serve as co-executor (in response to Mackay's assurances that Glenn Miller's estate was almost completely settled and MacGregor was not needed), Mackay became sole successor executor under Glenn Miller's will and began to take executor's commissions. As indicated above, Mackay was also still receiving one third of the royalties that accrued under the 1963 payment schedule on the RCA contract, which was due to expire on March 15, 1967.

In letters to Steven Miller and Jonnie Soper, dated June 20, 1968, Mackay explained the arrangements that he had with Mrs. Miller concerning his receipt of one-third of the RCA royalties, after the $15,000 exclusion each year. He also explained that he had been receiving annual fees of $5,000 from the Glenn Miller estate for legal services. Mackay proposed that in the future the $15,000 exclusion be eliminated, thereby entitling him to one-third of all royalties, and also that the $5,000 legal services

fee be eliminated. Although it would appear that this would make no difference in Mackay's income unless the royalties fell below $15,000 in any year, in which case Mackay would earn less than he had before, it is worth observing that if Mackay had closed the Glenn Miller estate by December 31, 1967, as the trial court found that he should have, he would no longer have received the annual $5,000 for legal fees to the estate.[1] As it was, both Miller and Soper agreed to Mackay's proposal, and Mackay continued to receive one-third of the royalties thereafter.

Sometime in 1975, after a disagreement between respondents and Mackay, respondents initiated an investigation into Mackay's dealings in relation to the estate. As a result of that investigation respondents brought an action for an accounting and to surcharge Mackay for certain monies that they alleged he wrongfully took. After a fourteen day trial, the trial court issued an opinion containing several findings.

The court found that Mackay had improperly computed certain executor's commissions. It refused to find, however, that Mackay had improperly charged attorney's fees to the Glenn Miller estate. Although these findings were the subject of appeal and cross-appeal in the Appellate Division, the parties do not raise them before us.

The sole issue that we face is whether there is sufficient credible evidence to support the trial court's conclusion that the documents executed by Mrs. Miller did not entitle Mackay to receive one-third of the income of the RCA royalties after March 15, 1967.[2] See *State v. Johnson,* 42 *N.J.* 146, 162 (1964).

---

[1] In Mackay's letter, he seems to assume that he was entitled to continue to receive one-third of the RCA royalties after the last RCA agreement expired. Whether he believed this at the time or whether he did not but wanted Miller and Soper so to assume, we cannot say.

[2] The trial court held that in agreeing to the terms as stated by Mackay in the June 20, 1968 letter, respondents agreed to allow Mackay to continue to

## II

On their face the documents that granted Mackay a one-third interest in the proceeds of the RCA royalties do not give. any indication of how long Mackay was to continue to receive that interest. The trial court's task then was to resolve the ambiguity as to the duration of Mackay's interest by examining the intent of the parties in the context of well-settled principles of law. Perpetual contractual performance is not favored in the law and is to be avoided unless there is a clear manifestation that the parties intended it.. *West Caldwell v. Caldwell*, 26 *N.J.* 9, 29 (1958); *Koch v. Koch*, 95 *N.J.Super.* 546, 550 (App.Div.1967); 1 *Williston on Contracts* § 38 (3d ed. 1957); 3 *Corbin, Contracts* § 553 (1960). The documents themselves contain no words that would indicate such intent. The trial court was unable to find any clear manifestation in the record that Mrs. Miller intended to give Mackay an interest that would last in perpetuity, nor did Mackay ever testify that Mrs. Miller acknowledged at any time that he had such an interest.

The parties' conduct, in fact, could reasonably be interpreted to indicate the opposite. Each time the payment schedule was extended, Mackay insisted that Mrs. Miller execute a new document. If, as appellant now argues, the original transfers gave an interest in royalties as long as they accrued, it would not have been necessary to modify those transfers merely because the payment schedule was modified. Also of impor-

---

receive a third of the RCA royalties. The court determined, however, that this agreement was procured as the result of Mackay's undue influence over respondents and was therefore void. Mackay does not attack the court's finding of undue influence, but rather argues that because Mrs. Miller gave him a permanent interest in the RCA royalties, respondents' permission was not required for him to continue receiving his one-third share. Mackay characterizes the June 20, 1968 letter as a mere request for modification of the terms of payment. Since Mackay admits that the respondents did not, by their assent to the terms in the letter, grant Mackay any interest in the RCA royalties, we need not address the question of whether that assent was procured by undue influence.

tance is the fact that Mrs. Miller expressed a desire to give Mackay an interest in the royalties on a year-to-year basis. Only when Mackay convinced her that such an arrangement would have an adverse tax effect did she sign the transfers as written by Mackay. Her attempt to pay Mackay yearly is a strong indication that Mrs. Miller never intended Mackay's interest to be perpetual.

In short, after canvassing the entire record, we conclude that there is sufficient support for the trial court's finding that Mrs. Miller did not intend Mackay to continue to receive a one-third interest in the RCA royalties for as long as they continued to accrue. See *State v. Johnson, supra,* 42 *N.J.* at 162.

The trial court next found that "the parties intended that Mackay's right to participate in the royalties run only as long as the period of the guaranteed payment for the royalties in the underlying contracts between RCA and the Glenn Miller estate." Those guaranteed payments ended on March 15, 1967, and, therefore, so did Mackay's interest.

In its effort to arrive at the termination date the trial court was again faced with the task of determining the parties' intent. Ordinarily, if a contract contains no express terms as to its duration, it is terminable at will or after a reasonable time. *Esslinger's v. Alachnowitz,* 68 *N.J.Super.* 339 (App.Div.1961); see *P.S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 *F.*2d 125, 128 (7th Cir. 1972); 1 *Williston on Contracts* § 38 (1957); 1 *Corbin, Contracts* § 96 (1967). As is pointed out in the Restatement of Contracts, when parties to a contract have not agreed in respect of a term that is essential to a determination of their rights and duties, a term that is reasonable in the circumstances is supplied by the court. *Restatement (Second) of Contracts* § 204 (1981).

Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. *But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. [Id.,* comment d (emphasis supplied).]

Considering the effort that Mackay expended in connection with the RCA recording contracts and the return that he received for that effort (more than $400,000 between 1952 and 1967), there is adequate evidence buttressing the trial court's finding that March 15, 1967 was a reasonable termination date for Mackay's interest in royalties.

Moreover, if a definite period of time can be inferred from the conduct of the parties and the surrounding circumstances, then that time period should govern the duration of the agreement. *Ricke v. Ricke*, 83 *Ill.App.*3d 1115, 1120, 39 *Ill.Dec.* 598, 603, 405 *N.E.*2d 351, 356 (1980); *Medders v. Medders*, 40 *N.C.App.* 681, 685, 254 *S.E.*2d 44, 47 (1979). Several facts support the inference that Mrs. Miller intended that Mackay's interest would end on March 15, 1967. Of greatest importance is the close link between the RCA royalty contracts and the documents transferring an interest in those royalties to Mackay. The 1954 and 1955 RCA contracts, and the subsequent amendments to the latter, contained fixed periods during which guaranteed payments were to be made. Each time the payment schedule was modified and extended, Mackay asked Mrs. Miller to sign a new document that gave him an interest pursuant to the new RCA agreement. Surely this supports the inference that Mrs. Miller understood that the interest she was assigning to Mackay was limited in time to the payment schedules in the underlying RCA contracts. If it were otherwise, there would be no reason for her to sign a new document every time the payment schedule—and only the payment schedule—was changed. Mrs. Miller's attempt, mentioned above, to put Mackay's interest on a year-to-year basis further supports this inference.

Additional support for the March 1967 termination date is manifest from what the parties believed would be the revenues under the RCA contracts. Mackay admitted that none of the parties realized how profitable the sale of the RCA records would be. In his first intermediate accounting as successor executor of the Glenn Miller estate, dated September 10, 1970,

Mackay stated that it was anticipated that the amounts paid under the RCA contract would have decreased until there was no probability of further income. If this is so, it is unlikely that Mrs. Miller contemplated that Mackay would go on receiving payments indefinitely. It seems more likely that she believed that by the time the last payment schedule expired, *i.e.*, March 15, 1967, the Glenn Miller estate, and as a result David Mackay, would no longer be receiving income from RCA.

Finally, there are the writings themselves. Where an ambiguity appears in a written agreement, the writing is to be strictly construed against the draftsman. *Terminal Construction Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Authority*, 18 *N.J.* 294, 302 (1955). It is undisputed that Mackay drafted the documents giving him an interest in the RCA contracts. The 1951 document is in his handwriting. If he wanted to ensure that his interest in the royalties would continue as long as royalties accrued, it would have been simple so to word the documents. Mackay's failure to do so must be construed against him and in favor of Helen Miller.

We cannot agree that, as urged by the dissent, *post* at 231, the use of the words "sell, assign, transfer and set over" will suffice to convey a permanent interest to the transferee. The quotation from *Hirsch v. Phily*, 4 *N.J.* 408 (1950), invoked by the dissent in support of that proposition, is less than compelling when read in context.

Here is the relevant part of *Hirsch* :

The first paragraph quoted uses the technical words of assignment: "we * * * sell, transfer and set over * * * the claim and account set forth above, and all our right, title and interest therein," etc. The second paragraph quoted employs the traditional language of a power of attorney which has been used for centuries in the common law to describe the rights of an assignee: "and hereby constitute and appoint * * * S. Hirsch our true and lawful attorney irrevocable, for use and in [sic] name and stead, the foregoing accounts, and to receive all moneys due or to grow due thereon." It is difficult to conceive of more effective language to express an outright assignment either technically or historically. [*Id.* at 413–14.]

It is clear that the document examined in *Hirsch* contained more than the words "sell, assign, transfer and set over" to convey the interest of the parties. We find no support in the law for the proposition that the use of those words alone "establishes a permanent assignment in the absence of sufficient credible evidence that the parties intended the assignment to be temporary." *Post* at 240. Especially where, as here, the agreement in question was drawn by a party who had a greater sophistication in drafting legal documents, the Court must examine all the evidence with an eye toward determining the true intent of the parties.

All of this evidence lends ample support to the trial court's conclusion that the circumstances give rise to a compelling inference that Helen Miller intended Mackay's interest to terminate when the final guaranteed payment under the RCA agreement was made, *i.e.*, March 15, 1967.

Judgment affirmed.

PASHMAN, J., dissenting.

The majority finds that the evidence supports a "compelling inference" that Helen Miller intended David Mackay's right to royalties to end on a specific date in 1967. *Ante* at 222. I find that the evidence supports no such inference, much less a compelling one. The majority's description of the facts is difficult to reconcile with what the record shows. The majority has misconstrued the various contracts, misdescribed important events, misinterpreted the intent of the parties and misapplied the law of contracts. I would reverse the judgment of the Appellate Division and hold that the finding of the trial court that the parties intended Helen Miller's assignment of royalties to Mackay to be temporary is not based on sufficient credible evidence. Because I believe the majority does not accurately describe what happened here, I must recount the rather complicated facts in detail. After doing so, I will discuss my differences with the majority's legal analysis.

# I

Glenn Miller disappeared on a military flight in 1944. After the War Department declared him dead in 1945, his wife, Helen Miller, became executrix of his estate. David Mackay had been her husband's attorney since 1939. After Miller's death, Mackay served as attorney for the Glenn Miller estate.

In the five or six years following Miller's death, the royalties from the sale of Miller's records declined substantially. In 1948, the estate earned $54,342.48 in royalties. By 1951, this had fallen to $14,415.94.

In response to this decline in income, Mackay conceived an idea that might increase the royalties earned by the estate. He suggested to Helen Miller that the recordings of Glenn Miller's radio performances be turned into records. Glenn Miller had recorded these broadcasts to evaluate and improve the orchestra's performance. These recordings or "air checks" were of poor quality. After Miller's death, his orchestra personnel intended to discard them. They evidently felt that the air checks were valueless. Rather than let the air checks be destroyed, Mackay removed them from Miller's office and preserved them.

When Helen Miller decided to pursue Mackay's idea of converting the air checks into records, Mackay offered to do the substantial work necessary to prepare them for possible use by Radio Corporation of America (RCA). In return, Helen Miller offered Mackay one-third of the royalties earned from the sale of any records made from the air checks.

Having received Helen Miller's approval and her offer of one-third of the royalties, Mackay spent hundreds of hours preparing the 250 air checks for presentation to RCA. He listened to each of them and catalogued them. He later monitored their recording by RCA. An expert witness testified that the task of preparing the air checks for presentation to RCA was a "monumental job." No one contests that assertion.

Once Mackay had done all the work to prepare the air checks, he presented them to RCA. He successfully persuaded RCA's

engineer to attempt to splice together the good portions of each selection. RCA liked Mackay's idea and determined that the air checks could indeed be made into records.

In August 1951 RCA entered into a contract with the Glenn Miller estate. Helen Miller signed the contract as executrix for the estate on August 14, 1951. In the contract, RCA promised to release three albums. One album would be produced each year from 1951 to 1953. Each album would contain eight selections from the 250 air checks. RCA agreed to pay the estate royalties of 6% of the retail list price of 91½% of the records sold.

The 1951 contract also granted RCA the option to release further albums containing *"any or all"* of the remaining air checks on the same terms. [emphasis added] RCA was to exercise the option by giving the estate notice prior to September 30, 1953. The contract stated at ¶ 2:

> If the foregoing option shall be exercised by us pursuant to the provisions of this contract, we shall have a series of successive one-year options, upon the same terms and conditions as herein provided for, which shall continue so long as we shall re-record and release at least one additional album of records in each such one-year period...

As long as one new album was produced each year, the option to produce new records from the air checks would go on indefinitely, as would the royalties. The contract further provided at ¶ 7:

> We shall have the right perpetually to manufacture and release phonograph records containing such of the recorded selections as are made and released by us under this contract.

Thus, RCA could continue to manufacture and sell any records produced under the contract "perpetually." The estate granted RCA this right in return for the right to royalties as long as the records were sold.

On the same day Helen Miller signed the 1951 contract with RCA as executrix for the estate, she signed a second contract that assigned to David Mackay one-third of the royalties earned. That second contract stated:

> For value received the undersigned [Estate of Alton G. Miller By Helen D. Miller, Executrix] hereby sells, assigns, transfers and sets over unto David

Mackay a sum equivalent to one-third of the royalties to accrue to the undersigned from the agreement of August 15, 1951 entered into simultaneously herewith between the undersigned and Radio Corporation of America covering the recording and releasing of phonograph recordings to be made from Glenn Miller radio broadcast library reference recordings.

The contract between Mackay and the estate did not require Mackay to do anything. It was not a contract for hire or a service contract. Mackay had the right to receive one-third of the royalties earned whether or not he ever did anything else. Rather than a contract for future services, it was a sale of future royalties in return for Mackay's past services, without which no recordings would have been made at all. Mackay had performed the hundreds of hours of work to prepare the air checks after Helen Miller specifically offered him one-third of whatever royalties would be earned. If Mackay had not done this work, there would have been no records and no royalties. He conceived the idea. But for him, these old records would still be sitting in a drawer.

Because the records released under the 1951 contract were well-received commercially, RCA and the estate signed a second contract in 1954. The 1954 contract modified the 1951 contract by changing the series of one-year renewable options to release new recordings to a right in RCA to make records out of any of the remaining 250 selections at any time. RCA promised to release between 1954 and 1959 recordings containing at least 80 of the selections. The contract did not end in 1959 since RCA could go on making and selling records after that date from selections not yet put on record. It could also continue to sell records of selections already released.[1]

---

[1]Although the 1954 contract did not explicitly contain the language of the 1951 contract which granted RCA the right to manufacture records "perpetually," the parties clearly did not intend to limit RCA's right to sell the records to the period of guaranteed payments. This is supported by the fact that RCA continued to sell records and pay royalties to the estate after the guaranteed payments ended in 1967.

The 1954 contract also modified the payment of royalties. RCA promised to pay the estate a flat 6% of the retail price of 90% of the records sold. Because many more records were selling than anyone had anticipated, the estate was earning substantial amounts in royalties. To lower the tax burden on this income, the 1954 contract provided that the payments would be spread out over time rather than paid as earned. RCA agreed to pay only $50,000 each year from 1955 to 1959 from the earned royalties. Any royalties above that amount would be held by RCA. When the accumulated amount earned exceeded $250,000, the excess would be paid to the estate as earned, semi-annually.

Several observations must be made about this new arrangement. First, the purpose of spreading out the estate's royalty income into the future was to lower the overall tax burden on the income. If the estate were to receive all the royalties as earned, a large chunk would be taken in taxes. By lowering the estate's income each year, a smaller amount would be paid to the government. Second, the purpose of the $50,000 payment was not to guarantee that a certain minimum would be earned each year. Rather, the parties intended to *limit* the amount paid in each year. The evidence demonstrates that everyone concerned expected royalties to exceed $50,000 each year. The $50,000 payments were merely a device to spread the payment of royalties into the future to reduce the estate's tax liability. Third, the contract did not end in 1959. While it is true that the guaranteed payments would cease in that year, it is clear that both parties contemplated that records would continue to be produced and sold after that date. As long as they were sold, royalties would be paid to the estate. Thus, neither the contract nor the royalties ended in 1959. The royalties would continue to be paid permanently, as long as the records were sold.

When the 1954 contract with RCA was signed, Helen Miller executed a document identical to the 1951 contract with Mackay. It granted Mackay one-third of the royalties earned under the 1954 contract. However, Helen Miller realized that the estate

had been earning roughly $15,000 a year in royalties from RCA on other records before 1951. Mackay was not entitled to a percentage of those royalties. Therefore, Helen Miller insisted that the 1954 contract with Mackay provide that he not receive any royalties on the first $15,000 earned, thereby limiting his one-third share to the excess.

Since the records continued to earn far more income than anyone had anticipated, a third contract between RCA and the estate was signed in 1955. Helen Miller again signed this contract as executrix for the estate. The 1955 contract amended the 1954 contract by extending the time of the $50,000 payments to eight years (rather than five) from 1954 to 1962. The purpose of this change was to spread out the royalty income even farther into the future. RCA also promised to record 120 of the selections as opposed to 80. The 1955 contract increased the $250,000 figure to $400,000 so that the estate would be paid royalties as earned only when the total of undistributed earned royalties exceeded $400,000. In all other respects, the 1955 agreement was identical to the 1954 contract.

In connection with the 1955 contract between RCA and the estate, Helen Miller signed a new document, dated March 1, 1955, which granted Mackay one-third of the royalties earned under the terms of the 1955 contract, again with the $15,000 exclusion. It is undisputed that Helen Miller did not in fact sign this contract until sometime in 1958. It is also undisputed that from 1955 to 1958, Helen Miller continued to pay one-third of the royalties earned under the 1955 contract to Mackay.

The reasons for her delay in signing the 1955 contract with Mackay are not clear. The record contains four letters by Mackay to Helen Miller from March 11 to June 10, 1955. In the first letter of March 11, Mackay wrote that the "change in the [1954] contract will require re-execution of the financial arrangement between you and me." In his June 10 letter, Mackay explained that if the 1954 contract with RCA had not been replaced by the 1955 contract, RCA would have had to pay the

estate on April 15, 1955 all royalties over $200,000. This would have amounted to $138,052.67. Mackay's share would have been $41,017.56. Instead, RCA paid the estate only $50,000, with the balance retained for future payment to the estate. Mackay's share of the $50,000 was $11,666.67. Mackay concluded:

> I point out the foregoing to you so that you may have these figures in mind in connection with my request that you update the agreement between us so that payments made to me are so made under the 1955 contract and not under the 1954 contract. I have previously written to you about this and I have also discussed it with you at some length over the telephone but you still have not sent me the updated agreement. You can readily see that if we are to continue to operate under the 1954 agreement [between the estate and Mackay], considerably more money would now be due me.

For some reason, Helen Miller did not immediately sign the 1955 contract with Mackay as he requested. There is some evidence in a 1958 letter to her from Mackay that she wanted to sign new assignments yearly, perhaps for tax purposes. Whatever the problem was, she continued to deliver to Mackay one-third of the royalties earned by the estate from 1955 to 1958 even though she had not yet signed the 1955 assignment. She clearly did not believe that her duty to pay Mackay royalties had ceased when the 1955 contract with RCA was signed. Moreover, she eventually signed the 1955 assignment to Mackay in 1958.

A fourth contract between the estate and RCA was signed on January 15, 1958. This contract increased the yearly payment from $50,000 to $100,000 and extended the minimum guaranteed payments from 1962 to 1964. It also raised the $400,000 figure to $700,000, ensuring that no money would be paid to the estate over $100,000 per year from the earned royalties unless the accumulated earnings had exceeded $700,000. This contract was much shorter than the previous contracts and clearly stated that it was merely an amendment of the terms of the 1955 contract.

In connection with the fourth RCA contract, Helen Miller signed another assignment to Mackay. The wording was the same as the 1955 assignment except that it adds the words "as amended by the 1958" agreement.

The fifth RCA contract was signed in 1960. It extended the minimum $100,000 payments from 1964 to 1965. It also reduced the $700,000 figure to $500,000. Helen Miller again executed an assignment to Mackay of one-third of the royalties earned under the 1960 contract. This assignment was different from the previous ones. It stated that Mackay had a one-third interest in the monies to accrue to the estate under the 1955 contract with RCA and "any amendments thereof." This wording was intended to obviate the need for any future updates of the assignment contract as the underlying RCA/estate contract was modified.

Two more contracts were signed with RCA in 1962 and 1963. The 1962 contract extended minimum payments of $100,000 per year to 1966. It reduced the $500,000 figure in the 1960 contract to $400,000. The 1963 contract extended minimum payments to 1967.

Helen Miller died on June 2, 1966. She left her entire estate in two testamentary spendthrift trusts to her two children, Jonnie Soper and Steven Miller. Mackay was named successor executor of Glenn Miller's estate.

On March 15, 1967, the minimum guaranteed payments of $100,000 per year stopped under the 1963 agreement. This did not mean that the payment of royalties stopped or that the other contractual rights of RCA or the estate ceased to exist. The royalty payments continued. The only difference was that now the royalties were paid as earned (6% of 90% of the sales proceeds of the records) rather than spread out over the future in smaller amounts.

In a June 20, 1968 letter to Helen Miller's children, Jonnie Soper and Steve Miller, Mackay suggested that they alter the terms of the assignment contract. He did not ask them to extend the assignment. After the minimum payments ceased in 1967, royalties continued to be paid to the estate and one-third of those were paid to Mackay. He suggested revoking the $15,000 exclusion so that Mackay would get one-third of all royalties earned, including the first $15,000. At the same time,

Mackay would give up his right to a $5,000 yearly payment for miscellaneous legal services to Glenn Miller's estate. The result changed nothing in terms of the dollar amount paid to Mackay, since the $5,000 payment to Mackay equalled one-third of the $15,000. Nothing in this letter to Jonnie and Steve or in a second letter dated July 9, 1968 suggests that he needed their consent to continue to receive one-third of the royalties. Jonnie Soper agreed to the change in the terms of the assignment.

In 1975, Steven Miller and Jonnie Soper sought an accounting of the estate and a surcharge of Mackay as executor for money he had wrongfully taken from the estate. On July 13, 1977, the trial court made various findings not at issue here. The only question here is the trial court's finding that Mackay was not entitled to receive any royalties after March 15, 1967, the date on which the guaranteed payments stopped under the last RCA contract. The Appellate Division affirmed the trial court on March 6, 1981 substantially for the reasons expressed in its opinion. We granted Mackay's petition for certification on the issue of the legal effect of the assignments.

## II

The issue in this case is whether Helen Miller granted David Mackay the permanent right to one-third of the royalties earned under the RCA contracts or whether she intended his right to royalties to end eventually even though the payment of royalties to the estate did not end. The majority of this Court concludes that the documents signed by Helen Miller are ambiguous on this question. It therefore surveys the surrounding circumstances to conclude that the record adequately supports the trial judge's findings that Miller did not intend Mackay to receive royalties as long as they were paid to the estate. Relying on changes in the RCA contract that occurred many years after Miller had signed the original assignment, the majority concludes that 1967 is a reasonable stopping point. I disagree for many reasons.

First, the majority makes far too much of the ambiguity. In doing so, it unjustifiably ignores the express language in the contract. It is true that when contractual language is ambiguous, we look to the surrounding circumstances to determine the intent of the parties. However, the words in the contract are the primary indicator of that intent. *Hirsch v. Phily*, 4 *N.J.* 408, 413 (1950). Moreover, it is not the case that language is either completely clear or completely ambiguous. Some words are clearer than others, depending on their context and their ordinary meaning. Some language is susceptible of only one meaning; other language only vaguely suggests a meaning. The clearer the language in the contract, the more hesitant we should be about using the parties' conduct to override the clear import of the words. Thus, to interpret the parties' intent properly, we must begin by examining the contractual language to see how ambiguous it is. One way to answer this question is to ask whether reasonable persons would agree on what the words of the contract mean. Another test is to ask what words reasonable people would use if they intended a certain result.

In this case, the supposed ambiguity is one of omission. Helen Miller agreed to sell to Mackay a portion of the royalties "to accrue" under the RCA contracts. The documents do not explicitly state how long Mackay was to receive his interest. The majority concludes that if Miller and Mackay had meant Mackay to receive his interest permanently, they could easily have said so. *Ante* at 221–222. The fact that they did not creates doubt about their intent. However, the question is not whether either Miller or Mackay could easily have said that his interest was permanent. The answer to that question is obviously yes. The real issue is whether reasonable persons would have thought it necessary or prudent to state that the interest was permanent if they intended that result.

This Court has previously held that a contract that purports to "sell, transfer and set over" contractual rights is sufficient to convey a permanent interest in those rights. *Hirsch v. Phily*, 4 *N.J.* at 413. Other courts have agreed. *See Warner-Lambert*

*Pharm. v. John J. Reynolds, Inc.,* 178 *F.Supp.* 655 (S.D.N.Y. 1959), aff'd o.b., 280 *F.*2d 197 (2d Cir. 1960); *Spoor v. Q & C Co.,* 162 *F.*2d 529 (7th Cir. 1947). As Chief Justice Vanderbilt wrote in *Hirsch v. Phily, supra,*

It is difficult to conceive of more effective language to express an outright assignment either technically or historically. By the assignments all right, title and interest to the [contractual rights] in question was transferred . . . [4 *N.J.* at 414]

While it is true that the document in *Hirsch v. Phily* contained additional language supporting an intent to convey a permanent interest, there is no reason to believe that it was the additional language that caused the Court to remark on the clarity of the parties' intent. In fact, the language in the assignment here is simple and clear. Although Mackay could easily have stated that the assignment was permanent, it is difficult to imagine why he would have thought such a statement necessary. A "sale" is not normally a temporary arrangement.

At the same time, if Helen Miller had intended Mackay's interest to be temporary, would she have signed the document as Mackay worded it? The majority argues that ambiguous wording must be construed against Mackay, who was the drafter. *Ante* at 221. However, the majority fails to consider whether or not a reasonable person would have signed the contract as worded if she had intended Mackay's interest to be temporary. Granted that Mackay wrote the assignment, Helen Miller must have read it before signing. According to the trial court she was independent and an "astute business person." It is also clear that the word "sell" has an ordinary meaning that would be understood by a layperson to constitute a permanent transfer. If she had indeed intended to limit Mackay's interest, she would not have signed the contract as Mackay wrote it.

The majority argues that the assignment contracts "do not give any indication of how long Mackay was to continue to receive that interest." *Ante* at 218. The majority implies that the contractual language is so ambiguous that it gives no evidence of the parties' intent on the crucial question. But this

overstates the ambiguity. Moreover, it ignores the rule that the words of a contract are a primary indicator of the parties' intent. It is not true that the contracts "contain no words" that would indicate an intent to convey a permanent interest. *Ante* at 218. They contain the word "sells," which would be understood by laypersons and attorneys alike to convey a permanent interest. They also incorporate the provisions of the RCA contract. That contract clearly states that RCA had the right to produce records "perpetually" and that it would have the duty to pay royalties on all records sold.

Taking into account the express language of the assignments and the incorporation of the underlying contract, the assignments are far clearer than the majority admits. As the primary indicator of the parties' intent, those words should be interpreted to convey a permanent interest in the royalties unless the circumstances or the conduct of the parties clearly shows otherwise.

Second, the majority and the trial court erroneously rely on the doctrine that courts disfavor imposing perpetual contractual performance. *West Caldwell v. Caldwell*, 26 *N.J.* 9 (1958), on which the majority relies, is distinguishable. In that case the town of Caldwell agreed to provide sewer facilities to West Caldwell which agreed in turn to pay Caldwell for those services. More than forty years later, West Caldwell decided to build its own sewerage facilities. The court held that after forty years, West Caldwell had the right to stop paying Caldwell for its services and was free to build its own sewer system without being liable for breach of contract. That case stands for the proposition that when one party to a contract agrees to pay another for its services, it may decide to stop buying those services from the other party after a reasonable time without being liable for breach of contract.

This case, by contrast, is not a contract for services. No one is being required to buy the services of another for an unreasonable period of time. Mackay is not being compensated for

continuing services, but for his past services in getting the air checks ready for RCA in 1951. The contract between Mackay and the estate did not place any duties on Mackay to provide continuing services to the estate. He was entitled to royalties whether or not he ever did anything else. The only continued "performance" here is the payment of money by the estate to Mackay. And this "performance" arises only when RCA pays royalties to the estate.

*Koch v. Koch*, 95 *N.J.Super.* 546 (App.Div.1967), is also easily distinguishable. There a woman made a pre-nuptial promise to her future husband that his mother could live with them after their marriage. After six years of this arrangement, the wife left the home with the children because of conflicts with her mother-in-law. The Appellate Division held that her promise to her husband had not been sufficiently definite to constitute a contract. *Id.* at 550. However, even if it had been a contract, the court would not have imposed on her the obligation to live with her mother-in-law permanently. Thus, the court would not enforce the agreement between the parties.

By contrast, this case involves no duty of performance by anyone other than the payment of money. Neither the estate nor Mackay is required to do anything. The agreement puts no unreasonable burden on the estate. The only duty on the estate is to pay to Mackay one-third of any royalties it receives from RCA, when and if it receives them.

The payment of royalties is not illegal merely because it lasts a long time. This case is actually more like *Warner-Lambert Pharm. Co. v. John J. Reynolds, supra.* In *Warner-Lambert*, defendant agreed to pay royalties to plaintiff as long as it made and sold Listerine, which had been concocted by plaintiff. After having paid millions of dollars in royalties, defendant sought to end the agreement, arguing that it was void as a contract in perpetuity. The court held that defendant had a duty to keep paying royalties as long as Listerine was manufactured and sold.

Similarly, in this case, RCA has a duty to pay the estate royalties as long as the records are sold. No party contends that RCA could stop paying royalties to the estate. If there is no limit on RCA's duty to pay royalties to the estate, why is there a limit on the estate's duty to pay one-third of any royalties it receives to Mackay? The estate is not being forced to buy services from Mackay. It is also not being unduly burdened by the legal obligation. If it is reasonable to require RCA to continue paying royalties to the estate as long as it releases records, it is also reasonable to require the estate to pay Mackay his fair share when the estate receives those royalties.

The presumption against perpetual contractual performance is inapplicable when the contract will terminate upon the occurrence of a specific event expressly or impliedly contained in the contract. *Payroll Express Corp. v. Aetna Casualty and Surety Co.*, 659 *F.2d* 285, 291–92 (2d Cir. 1981). Thus, defendant in *Warner-Lambert* was obligated to pay royalties only so long as it continued to manufacture Listerine; the contract was not one in perpetuity since it defined the limits of defendant's obligation. 178 *F.Supp.* at 661–63. *See Timely Products, Inc. v. Costanzo*, 465 *F.Supp.* 91, 96 (D.Conn.1979) (stating in dictum that when federal patent law did not provide otherwise, court would enforce contractual obligation to pay royalties as long as the product was manufactured); *Laff v. John O. Butler Co.*, 64 *Ill.App.*3d 603, 21 *Ill.Dec.* 314, 381 *N.E.*2d 423, 433–34 (1978) *cert.* den. 444 *U.S.* 844, 100 *S.Ct.* 88, 62 *L.Ed.*2d 57 (1979) (holding that where the intent of the parties was to enter into a contract for the use of a trade secret in return for the payment of royalties, the obligation to pay royalties would continue as long as the formula was used since the parties did not specify otherwise).

In *Lura v. Multaplex*, 129 *Cal.App.*3d 410, 179 *Cal.Rptr.* 847 (1982), defendant solicited plaintiff's assistance in obtaining various business accounts. When plaintiff successfully procured those customers for defendant's business, the parties entered into a contract in which defendant promised to pay plaintiff a commission on each of the accounts. The contract contained no

term specifying how long the commissions would be paid. The court held that defendant was contractually obligated to pay the commissions as long as he continued to make sales to the customers which plaintiff had procured. The court reasoned that the contract was not one in perpetuity:

Since respondent's obligation to appellant is contingent upon its sales to the accounts he secured, the agreement is of a limited duration—until respondent stops selling to those accounts. Further, far from being obligated to make payments forever, respondent could at any time terminate its obligations to appellant by ceasing to sell to the accounts. The mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties ... Respondent's arguments based upon a public policy against contracts in perpetuity are inapposite. [179 *Cal.Rptr.* at 849 (citation omitted)]

The court further supported this result by noting that the case did not involve a personal service contract. The court was not forcing defendant to continue to employ plaintiff or reimburse him for continuing services. *Id.* Plaintiff's only duty under the contract was to secure the accounts. Once he had done this, "the only obligation remaining was that of respondent to pay the agreed compensation." *Id.* Since plaintiff had already performed all the services he was contractually obligated to perform, defendant was obligated to continue paying the commissions to him as long as it continued to benefit from the accounts he had secured. *Id.* at 850.

The situation here is no different than that in *Lura v. Multaplex.* The contract is not one in perpetuity since the estate's obligation to pay royalties to Mackay will cease whenever RCA s⟨ ⟩ps selling records and paying royalties to the estate. Moreover, Mackay has already performed all the services he was contractually obligated to perform. The only remaining obligation is the estate's "unilateral" obligation to pay a share of the royalties to Mackay whenever RCA pays them to the estate. *See id.* at 849. As long as the estate continues to benefit from Mackay's past services, it is obligated to pay him his share of the royalties.

The majority's third argument is that "none of the parties realized how profitable the sale of the RCA records would be." *Ante* at 220. This is undoubtedly true. Helen Miller probably believed that the records would not continue to sell as long as they did. When the records stopped selling, the payment of royalties to the estate would end, as would Mackay's share. However, the majority incorrectly infers from this fact that Helen Miller probably would have intended Mackay's share to end *even if the payments to the estate did not end.* It does not follow that because the profits were higher than expected, the estate can now be relieved from its legal duty to Mackay. It is also not relevant that the majority considers Mackay's share of the royalties between 1951 to 1967 to be adequate compensation for his services. *Ante* at 220. Again, could RCA be relieved from its duty to pay royalties to the estate merely because the estate has already earned far more money than anticipated? Of course not.

Fourth, the majority and the trial court incorrectly state that the RCA contracts "expired" in 1967. *Ante* at 217 n.1, 221. This is simply not true. It is also not true that the RCA contracts "contained fixed periods during which guaranteed payments were to be made." *Ante* at 220. The original 1951 contract contained no provision at all limiting the total amount of royalties or the time during which they would be paid. The modification in the payment schedule in subsequent contracts was not intended to ensure guaranteed minimum payments to the estate. It was also not intended to limit the number of years during which payments would be made. Those modifications were designed for tax purposes to limit the total amount paid in any one year. While it is true that no payments were guaranteed after 1967, RCA was obligated to continue paying royalties as long as it sold records. Eventually, if records continued to be sold, royalties would be paid above and beyond the scheduled payments. Nothing in the underlying contract limits the payment of royalties to any fixed period. In

fact, RCA continued to sell records after 1967 and to pay the royalties to the estate.

It is also important to remember that *Mackay* induced RCA to change the payment schedule in 1954 and afterwards to decrease the estate's taxes. It is difficult to see what relation those modifications in the payment schedules have to *Helen Miller's* intent. The modifications in the royalty agreements were made years after she had signed the original assignment to Mackay and the original contract with RCA which had no such payment schedule. And even if Helen Miller thought that RCA's payments to the estate would end in 1967, there is no evidence that she would have wanted Mackay's share to cease when the payments to the estate continued.

Fifth, the majority argues that Mackay's conduct demonstrated that he understood the assignments to be temporary. *Ante* at 218–219. If the original assignments gave a permanent interest in the royalties, Mackay would not have insisted that Helen Miller sign new assignments just because the payment schedule was modified.

The majority implies that Mackay's insistence that Miller sign new documents indicates that he believed the assignment had to be periodically renewed. Yet Mackay did not ask her to sign new documents periodically; he asked her to do so only when the underlying contract was modified. Moreover, in 1960, he changed the language of the assignment to obviate the need for any modifications in the assignment. This demonstrated that Mackay did *not* believe the assignment would have to be periodically renewed. In fact, the assignments had been modified only when the underlying contract was modified.

Why did Mackay insist on the modifications in the assignments? In one of his 1955 letters to Helen Miller, Mackay explained that the assignment had to be modified to make the estate's legal duty to him compatible with the new payment schedule in the 1955 contract. He felt that unless Helen Miller modified the assignment, the estate would be legally obligated

to pay him on the basis of the schedule in the 1954 contract. By signing the new assignment, Miller would decrease the estate's legal obligation to Mackay to one-third of the lower payments made under the 1955 contract. This demonstrates that Mackay believed that the 1954 assignment remained in effect even after the 1955 contract had been signed. It also shows why he insisted that she modify the assignments when the payment schedule was modified.

Mackay also explained in a 1958 letter to Miller that when the estate income tax return for 1955 was audited, the field agent called for the 1954 assignment. When shown it, the agent deducted the payment to Mackay from the estate's income. Mackay feared that without a new assignment keyed to the 1955 contract, the estate would not be allowed to deduct from its income the payments made to Mackay. It would therefore be taxed for money it did not earn.

Whether or not Mackay was right in believing that new assignments were legally required, his conduct gives no evidence at all that he believed the assignments to be anything other than permanent. In fact, the evidence in the record demonstrates that he believed the new assignments were needed to limit both the estate's tax liability and its legal obligations in any one year to Mackay.

Sixth, the majority argues that Helen Miller's conduct indicated that she did not intend Mackay's interest in the royalties to continue permanently. *Ante* at 219. Because she attempted to give Mackay an interest in the royalties on a year to year basis, she never intended it to be permanent. I find this inference untenable. The record contains no evidence as to why Helen Miller wanted to give Mackay yearly assignments. But whatever her reason, the record is clear that she decided *not* to renew the assignments yearly. In fact, the evidence shows that she did not believe that absent a yearly assignment, her obligations to Mackay would end. She continued to pay him his share of royalties between 1955 and 1958 even though she had not

signed the 1955 assignment. She clearly felt bound by the 1954 assignment as late as 1958. Whatever the reason for the delay in signing the 1955 assignment, the fact is that she did sign it. She also signed new assignments in 1958 and 1960. Moreover, she signed no new documents at all after 1960. Yet as executrix of the estate she continued to give Mackay his share of the royalties.

Whatever her reason for seeking to give yearly assignments to Mackay, Miller continued to pay Mackay his one-third share for fifteen years until her death. Is this the conduct of a person who thought Mackay's share was temporary? If so, I cannot imagine how a person would act if she intended his share to be permanent.

### III

I would hold that a contract that purports to "sell, assign, transfer and set over" a portion of continuing royalties to accrue under another contract establishes a permanent assignment of that portion of the royalties in the absence of sufficient credible evidence that the parties intended the assignment to be temporary. I conclude that the trial court's finding that the parties intended the assignment to be temporary is not based on sufficient credible evidence in the record. I would reverse the judgment of the Appellate Division and hold that the record is devoid of evidence that Helen Miller intended Mackay's interest to end even though royalty payments to the estate continued. Mackay was entitled to receive his share as long as RCA continued to pay royalties to the estate.

Chief Justice WILENTZ and Justice HANDLER join in this opinion.

*For affirmance*—Justices CLIFFORD, SCHREIBER, POLLOCK and O'HERN—4.

*For reversal*—Chief Justice WILENTZ and Justices PASHMAN and HANDLER—3.